VELLE TRANSCENDENTAL RE-
SEARCH ASSOCIATION, INC., a California Nonprofit Corporation, and Richard M. Brayton, Plaintiffs,

v.

Ed SANDERS, E. P. Dutton & Co., Inc., a New York Corporation, and Avon Books, a Division of The Hearst Corp., a New York Corporation, Defendants.

No. CV 74–2985–RJK.

United States District Court,
C. D. California.

May 27, 1981.

Cossack & Artz, Law Offices of Paul Sweeney, Los Angeles, Cal., for plaintiffs.

Mayer, Brown & Platt, Watson B. Tucker, Chicago, Ill., Johnson, Manfredi & Thorpe, George A. Manfredi, Brien F. McMahon, Los Angeles, Cal., for defendants.

## MEMORANDUM OF DECISION AND ORDER

KELLEHER, District Judge.

This is an action for libel brought against the author and publishers of a book entitled, *The Family*, which addresses the activities of Charles Manson and his followers in the late 1960's. The action was filed on October 20, 1972, in the Northern District of Illinois. On October 18, 1974, it was transferred to the Central District of California before Judge Robert Firth. Over four years later, the case was transferred to this Court. On April 13, 1981, defendants filed a motion for summary judgment based on their view that at the time of publication plaintiffs were "public figures" within the meaning of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Defendants' motion for summary judgment thus raises the following two issues: First, are plaintiffs Velle Transcendental Research Association and Richard Brayton "public figures" as to whom the *New York Times v. Sullivan* standard of "actual malice" should apply? Second, if plaintiffs are "public figures," is there any genuine issue as to a material fact regarding whether defendant Sanders wrote the allegedly defamatory statements, or whether defendants E. P. Dutton and Avon published them, with "actual malice"?

Plaintiff Velle Transcendental Research Association, Inc., is a California nonprofit corporation which purportedly exists to promote the study of diverse religious, philosophical and educational views. Plaintiff Richard Brayton is a member of Velle. Defendant Ed Sanders is the author of the hardcover and paperback editions of *The Family—The Story of Charles Manson's Dune Buggy Attack Battalion*. Defendant E. P. Dutton is a New York corporation which published and distributed the hardcover edition of *The Family* in October of 1971. Defendant Avon Books, a division of the Hearst Corporation, published and distributed the softcover edition of *The Family* in May of 1972. The allegedly defamatory statements appear on pages 73–74, 153–61, and 244 of the softcover edition, a copy of

which was filed with the Court as an exhibit. In essence, the allegedly defamatory statements concern a group that Sanders labels O.T.O., or the Ordo Templi Orientis. It appears undisputed that the O.T.O. is in many respects the same organization which now goes by the name of Velle Transcendental Research Association, plaintiff in this action. Plaintiff Richard Brayton and his wife, the alleged leader of the group O.T.O., are members of Velle and also were members of the O.T.O. Certain other principal members of the O.T.O. also hold key positions in Velle. This identity of relationship between O.T.O. and Velle is important because Sanders never refers to Velle in his book, but mentions only the Braytons and the O.T.O. Thus, earlier in this action, Judge Firth had granted summary judgment against plaintiff Velle on the ground that it had not been mentioned in the allegedly defamatory statements. However, having determined that a question of fact existed as to whether a reader could have understood defendant Sanders to be referring to Velle when he described the O.T.O., this Court vacated Judge Firth's prior order of summary judgment against Velle. The exhibits filed in regard to this motion for summary judgment also support the view that Velle Transcendental Research Association is essentially a corporate name adopted by the principal members of the group Sanders described as the O.T.O.

Pages 73–74, 153–161, and 244 of the softcover edition of *The Family* contain the allegedly defamatory statements. On pages 73–74, defendant Sanders describes the Ordo Templi Orientis as one of several "sleazo inputs," or Los Angeles area "death-trip groups" which existed at the time during which the Manson family was active and which he asserts may have had an impact on the development of Manson's character. Sanders points out on these pages that the O.T.O. is a group originally formed by Aleister Crowley, whom Sanders describes as an "English magician and father of sex magick." In fact, one of Velle's own publications includes the "Creed of Velle," which states that among those works studied by Velle were works of the

O.T.O., which the Creed describes as "[a] mystical organization, originally in England; based on the writings of Aleister Crowley." *Midnight Press*, vol. 1, no. 1, p. 3, Aug. 1971.

The main portion of the material alleged to be defamatory appears in Chapter Nine of Sanders' book, entitled "The Solar Lodge of the O.T.O." [pages 155–161]. Included in these pages are the allegations that members of the O.T.O. used drugs extensively, conducted animal sacrifices, drank animal blood, engaged in unusual sex acts, and participated in cult-like rituals. In this chapter, Sanders also states that Charles Manson may have visited the group, that the cult promoted racist attitudes among its members and that the Braytons owned several parcels of property in the Los Angeles area near U.S.C., one of which he describes as "a paradise pad for sex-magic chicken snuffers." Finally, on these pages Sanders also discusses the group's responsibility for the "Boy in the Box" incident. That incident occurred in Blythe, California in the summer of 1969. Sanders alleged that Jean Brayton, the supposed leader of the O.T.O., ordered a six-year-old boy to be kept in a packing crate for a period of two months as punishment for setting fire to the group's desert ranch. The boy was permitted to leave the box for showers, but was fed only bread and water and was kept chained by his ankle. In fact, this incident had been highly publicized during the years 1969 to 1971. It led to the conviction of four members of Velle on felony child abuse charges, including the boy's mother, and of three members of Velle, on misdemeanor child abuse charges. The Braytons were fugitives for eighteen months. Charges against Richard Brayton were dropped for lack of evidence. Jean Brayton pleaded *nolo contendere* to one count of felony child abuse, was placed on three years probation and was fined $500.00. The publicity surrounding this incident comprises the crux of defendants' argument that plaintiffs are public figures.

1. *Public Figure Plaintiffs*

On March 9, 1964, the Supreme Court's unanimous decision in *New York*

*Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) radically altered the judicial treatment of a private cause of action for libel or slander by placing a significant constitutional limitation on the ability of a public official to recover. Reasoning that the defense of "truth" as determined by judge and jury does not protect the full degree of free expression guaranteed by the First Amendment, Justice Brennan stated that:

> The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" —that is, with knowledge that it was false or with reckless disregard of whether it was false or not.

*Id.* at 279–80, 84 S.Ct. at 725–26. In 1974, in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 the Court redefined the class of plaintiffs to whom the actual malice standard would apply by making it available in the context of defamation of "public persons":

> Those who, by reason of the notoriety of their achievements or the *vigor and success with which they seek the public's attention,* are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on *clear and convincing proof* that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth.

*Id.* at 342, 94 S.Ct. at 3008 (emphasis added). Provided the underlying evidentiary facts are undisputed, it is a question of law for the Court to determine whether a particular plaintiff is a "public official" or "public figure" for purposes of applying the *New York Times* test. *Rosenblatt v. Baer,* 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966).

The *Gertz* case defined two classes of "public figures." The first is the "all purpose" public figure who has "achiev[ed] such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts." *Gertz v. Robert Welch, Inc.,* 418 U.S. at 351, 94 S.Ct. at 3013. The second category is that of the "limited purpose" or "vortex" public figure. "More commonly, an individual voluntarily injects himself *or is drawn into a particular public controversy* and thereby becomes a public figure *for a limited range of issues." Id.* (emphasis added). Often public figures of this latter sort "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." *Id.* at 345, 94 S.Ct. at 3009. Unlike the "all purpose" public figure, the "vortex" or "limited purpose" public figure loses some protection for his reputation *only as the communications relate to his involvement in the public controversy.* Thus, since plaintiffs cannot be said to be "all purpose" public figures, the questions of law for the Court are whether the underlying facts surrounding the publicity of the "Boy in the Box" incident make plaintiffs limited purpose public figures, and, if so, what is the proper *scope of the public controversy* as to which the *New York Times* actual malice standard would apply.

▪▪ The cases decided since *New York Times* and *Gertz* make it clear that a person (or group) is not considered a "public figure" solely because that person is a criminal defendant, *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), has sought relief through the courts, *Time, Inc. v. Firestone,* 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), or is involved in a controversy which is newsworthy. *Id.* Instead, the Court often has required that the plaintiff undertake some voluntary act by which he seeks to influence the resolution of public issues.[1]

---

1. Plaintiffs argue that in certain circumstances even a plaintiff's voluntary acts, which have the effect of placing the plaintiff in the public eye, may not be sufficient to make that person a limited purpose public figure. For example,

in the *Firestone* case, the fact that Mrs. Firestone voluntarily had offered her reputation for public scrutiny by holding a press conference was held insufficient to make her a public figure. 424 U.S. at 454, 96 S.Ct. at 965. How-

In sum, whether a particular plaintiff's activities make him a limited purpose public figure is usually a very close question which can be resolved only by considering the totality of circumstances which comprise the publicity surrounding the controversy in which plaintiff is embroiled.

Defendants argue that plaintiffs became public figures, for the period of time during which *The Family* was published and for the scope of the statements made by defendant Sanders, because of the publicity surrounding the "Boy in the Box" trial in Riverside County, California. Defendants have submitted to the Court exhibits consisting of newspaper clippings from the *Los Angeles Times,* the *Los Angeles Herald-Examiner, The Washington Post,* the *Oakland Tribune,* and various Riverside County local newspapers, which were published between July 29, 1969, and January 21, 1972. These articles address the details of the abuse of six-year-old Anthony Saul Gibbons by the members of O.T.O., who were presently living at the ranch in Riverside County. The articles frequently mention Jean Brayton and Richard Brayton by name, and many mention that the group held for the boy's abuse belonged to a "cult-like" group called the O.T.O. For example, the *Daily News* of Indio, California, states on October 23, 1969, that those under indictment "were members of a 'group' known as OTO, which had headquarters at 2627 Menlo Ave., Los Angeles." The article describes the group's alleged purpose of seeking spiritual development and identifies the leader of the group as Jean Brayton, plaintiff's wife. Similarly, articles which appeared in the *Daily Enterprise,* the *Daily News,* and the *Daily News Palm Desert* describe those individuals indicted as members of the O.T.O. "cult." They depict the practice of the group as consisting of various degrees of membership, and point out that members of the first degree wear a black robe, those of the second wear a dagger and triangle, and so on. While the local articles are the most elaborate in their description of the group's practice of initiation and ritual, almost all of the articles address the issue of the group's unusual way of life. Most of the articles mention the O.T.O. and Jean Brayton as being responsible for the boy's treatment. Defendants argue that the publicity generated by these articles opened to public curiosity and scrutiny the issue of the O.T.O.'s way of life. Interestingly enough, plaintiffs' own brief to the Riverside County trial court, submitted in support of a change of venue motion, reaches the same conclusion. The group had argued that it could not get a fair trial in Riverside County, because the extensive newspaper coverage and certain television coverage by stations such as KABC, Los Angeles, had made the way of life of the O.T.O. cult a matter of public interest to most of the southwest. Indeed, the scope of coverage by the press exceeded the mere details of the young boy's abuse and focused as well on the question of the group's "cult-like" way of life. Based on the totality of the press coverage of the "Boy in the Box" incident and on the public inquiry into the way of life of those claimed to be responsible for it, the Court finds as a matter of law that the group's way of life was, during the years

---

ever, this holding in part was dependent on the Court's determination that the controversy itself was not "public." *Id.* Furthermore, the Court viewed Mrs. Firestone's acts as designed to "satisfy inquiring reporters" and *not* to influence "the merits of the legal dispute between [Mrs. Firestone] and her husband." *Id.* at n.3. In fact, the Court's holding that Mrs. Firestone was not a "public figure" was to a great extent based on its view that she had *not* "sought to use the press conference as a vehicle by which to thrust herself to the forefront" of some "public" controversy. *Id.*

To the contrary, here plaintiffs' voluntary acts of publishing four editions of their own news-paper and of sending letters and tapes to the media and to public officials were designed to influence public opinion both of the charges against their members *and* of the group's way of life. In fact, their publication also sought to make charges of its own against the Riverside County public authorities. Furthermore, whereas the underlying controversy in *Firestone* was determined not to be "public," here the character of the controversy is decidedly "public." Thus, because plaintiffs' entry into the public forum, unlike Mrs. Firestone's, was designed to influence public opinion, and was more extensive in its nature, plaintiffs are "public figures" within the meaning of *Gertz.*

1969 to 1972, a public controversy. Nonetheless, the foregoing does not alone make plaintiffs "public figures," because the Supreme Court has hesitated to hold as much merely because a person suspected of criminal conduct is in the public eye.

Indeed, the Supreme Court often has looked for some additional voluntary conduct by the plaintiff to render him a "public figure" for *New York Times* purposes. Here, plaintiffs voluntarily "thrust themselves to the forefront of . . . [the] public controvers[y] in order to influence the resolution of the issues involved." *Gertz v. Robert Welch, Inc.*, 418 U.S. at 345, 94 S.Ct. at 3009. They did so, after Richard and Jean Brayton returned from hiding, by publishing in the Riverside County and Los Angeles areas their own newspaper, the *Midnight Press*, both to refute the charges of the authorities regarding the "Boy in the Box" incident and to enhance the reputation of the group in the community. Not only does the act of publishing their own newspaper [2] make these plaintiffs "public figures" by providing the voluntary conduct necessary to complement the Court's finding that the controversy was "public"; but because plaintiffs' publication addressed the group's way of life, it also provides additional support for the view that the scope of the public controversy extended to matters involving the group's way of life. For example, the first edition of the *Midnight Press* contains the "Creed of Velle," which lists its purported purpose as being the study of various religious beliefs. Another edition publishes a public survey distributed by Velle which attempts to measure the effect on public opinion of the press coverage of the "Boy in the Box" incident. According to their own survey, 99 percent of the 225 persons polled recalled the incident two years later and well over half of those described the group as consisting of reli-

gious fanatics or hippies. Also, through the *Midnight Press,* plaintiffs published a "Plea for Religious Toleration," which addressed the plight of Velle and described its religious purposes. Finally, plaintiffs supplemented these efforts to influence public opinion by undertaking a letter-writing campaign, by requesting that the Grand Jury ·indict certain prosecutors, and by submitting documentary material, which was aired, to a television station. Taken in its entirety, the publicity generated by the press *and by plaintiffs themselves* placed into public controversy the group's way of life. Thus, the Court finds that plaintiffs are limited purpose "public figures" for this action, first, because the controversy was "public," second, because their own voluntary conduct "thrust" them into that public controversy, and third, because the scope of that controversy encompassed the scope of defendant Sanders' allegedly defamatory statements.

■ Under the *New York Times* test, a "public figure" plaintiff always must prove "with convincing clarity" that the defendant published a falsehood either knowing it was false or with a high degree of awareness of its probable falsity. Malice in the *New York Times* sense does *not* mean, in the common law sense, with hatred or ill will. *Garrison v. Louisiana*, 379 U.S. 64, 78–79, 85 S.Ct. 209, 217–218, 13 L.Ed.2d 125 (1964). Instead, the plaintiff must show that the defendant either deliberately falsified his statements or published them "recklessly," despite his awareness of their probable falsity. *St. Amant v. Thompson*, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). According to the Supreme Court in *St. Amant*, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publica-

---

**2.** Plaintiffs argue at the hearing of this motion that the publication of four editions of a newspaper of relatively small circulation should not make plaintiffs limited purpose public figures. However, as the Supreme Court made clear in *Firestone*, it is not alone the extent of the entry, but is the *purpose* with which plaintiff enters the public forum, that determines plaintiffs'

status for the *New York Times* analysis. Unlike Mrs. Firestone, whose meetings with the press were not designed to influence public opinion, plaintiffs entered the public forum to influence public opinion, *not* merely as it related to their trial, but also as it perceived the group's entire way of life.

tion." *Id.* at 731, 88 S.Ct. at 1325. Thus, the "focus of an inquiry under *New York Times* is the actual state of the knowledge of the defendant at the time of publication." R. Sack, *Libel, Slander, and Related Problems,* at 212 (1980) [PLI Pub. No. G1–0658] (citation omitted).

### a. *Falsity*

■ According to traditional common law, the burden was on the defendant to prove the truth of the allegedly defamatory statements. Although the Supreme Court has not spoken on this question, most commentators seem to agree that "in 'public figure' and 'public official' cases governed by the rule in *New York Times Co. v. Sullivan,* the plaintiff now almost certainly has the burden of falsity." *Id.,* at 40 (citation omitted). The Second Circuit so held in 1969 in the case of *Goldwater v. Ginzburg.* "In [a public figure] case the burden of establishing that the published material was false is on the plaintiff." 414 F.2d 324, 338 (2d Cir. 1969).

Despite the prevailing view that the public figure plaintiff must prove falsity to recover, plaintiffs here have offered no proof whatsoever that the allegedly defamatory statements were false, with two exceptions. First, despite Sanders' statement that Richard Brayton had been a professor at U.S.C., in fact Brayton had taught at a Los Angeles high school. Second, contrary to Sanders' claim that Charles Manson had visited the O.T.O. property in the U.S.C. area, in fact it appears instead that a Manson family member, Tex Watson, was the person who visited the O.T.O. Defendants admit these errors. The first, of course, hardly could be considered a defamatory falsehood. As to the second, which potentially could be considered defamatory by a jury, defendants maintain that it was an error of which Sanders was unaware, despite careful checking, at the time of publication. As to the matters beyond these two rather insignificant errors, plaintiffs promise extensive proof of falsity at trial. Therefore, for the purpose of this summary judgment motion, and for the following inquiry into the question of "actual malice," the Court has assumed the falsity of the allegedly defamatory statements.

### b. *Actual Malice*

Even assuming the falsity of Sanders' statements, it appears that plaintiffs cannot meet the difficult burden of proving by clear and convincing evidence that defendants published the statements either with actual knowledge of falsity or with serious doubts about their truth. Given that discovery is now completed, summary judgment is appropriate based on plaintiff's inability to produce any evidence of actual malice.

■ Courts have taken very different views of the appropriateness of summary judgment in public figure libel actions. Some take the view that summary judgment is preferred because the "mere pendency of unwarranted defamation litigation will deter protected expression." R. Sack, at 536. Another view is that summary judgment will often be granted, not as a policy, but because proof of "actual malice" is so difficult. *Id.* Other courts disfavor the granting of summary judgment on the issue of proof of "actual malice" because it addresses the defendant's state of mind, an issue best resolved at trial. *Id.* However, as with any summary judgment motion, the inability of a plaintiff to generate a genuine issue as to whether defendant published his statements with actual malice makes summary judgment appropriate. Thus, where plaintiff, having *completed* discovery as to a defendant's state of mind, still is unable to adduce evidence of his knowledge or suspicion of the falsity of his statements, summary judgment is proper.

■ Plaintiffs offer numerous reasons why defendant's investigation of the O.T.O. might support a finding of actual malice. First, plaintiffs argue that defendant Sanders' alleged failure to investigate the facts more carefully can be proof of actual malice. However, in the absence of a subjective awareness by the defendant that he should have investigated more carefully, mere innocent or negligent failure to inves-

tigate has been held not to establish actual malice. *St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968). Further, plaintiffs maintain that the character of defendant's sources should have made him aware of the need to corroborate or verify his information, Indeed, Sanders' sources were former members of the O.T.O., former members of the Manson family, and members of the "occult" world in the Los Angeles area. It is not surprising then that Sanders sought to and did derive his information from several sources, including at least *five* former members of the O.T.O., some of whom said they had observed the key events in person. In fact, after investigating the O.T.O. for a year, during the last six months of which he enlisted the assistance of a private investigator, the evidence offered by plaintiffs and defendants gives no indication whatsoever that he had reason to question the veracity of the information his sources provided. Thus, Sanders did seek and receive corroborating information from other sources, to the extent that he was able. But, given the nature of the subject, it was not likely that many of the other individuals who had personal knowledge of the subject would have consented to be interviewed. Finally, despite plaintiffs' conclusory claim that defendant's book was written with "muckraking" intent, no evidence is presented that any of the defendants had such a plan. On the contrary, there is clear evidence that, aside from the sensationalistic aspect of the subject matter itself, the defendants sought to assure the accuracy of the book's content.

As for the two defendant publishing companies, E. P. Dutton and Avon, plaintiffs offer absolutely no evidence that either had knowledge of the book's allegedly false statements or was aware of any reason to suspect falsity. On the contrary, defendants' evidence demonstrates that these publishers had received no prior complaints about the author, believed him to be reliable, and either conducted an independent check on the reliability of his sources (Dutton) or relied on the good reputation of the previous publisher.

Plaintiffs' proof fails genuinely to put in issue their claim that defendants Sanders, E. P. Dutton, or Avon published *The Family* either with knowledge of the falsity of the statements about the O.T.O. or about Richard Brayton or with some subjective awareness that there was a reason to suspect that those statements were false. Accordingly, it is hereby ORDERED that defendants' motion for summary judgment is GRANTED.