448 So.2d 271 (1984)
Charles B. FERGUSON, et al., Appellants,
v.
William E. WATKINS, et al., Appellees.
No. 54629.
Supreme Court of Mississippi.
February 29, 1984.
*272 Joe D. Pegram, Oxford, for appellants.
W. Joel Blass, Mize, Thompson & Blass, Gulfport, for appellees.
En Banc.
ROBERTSON, Justice, for the Court:

I.
This is a libel action brought against a newspaper and its editorial columnist.
Three physicians operating the emergency room in a publicly funded hospital demanded ouster of the hospital administrator. They were subjected to searing *273 commentary by an editorial columnist in a local newspaper.
We hold that such persons are not libeled even though described in caustic if not contemptuous language and even though to a neutral observer the criticism is unfair, so long as clear falsity of fact is not found in the editorial commentary. Alternatively, we hold that such persons are vortex or limited purpose public figures who may not recover in a libel action absent proof of actual malice.

II.

A.
The Marshall County Hospital was built in Holly Springs, Mississippi, many years ago. Construction was publicly funded under the old Hill-Burton Federal Hospital Construction Program. Substantial funding for the operation of the hospital since that time has been provided by the Marshall County Board of Supervisors from funds derived from taxes levied upon the citizens of that county. The hospital receives other public funds via payments on behalf of patients under the Medicare and Medicaid Programs.
The hospital operates an emergency room the medical services in which are under the direction of three physicians, Drs. Robert P. Tate, Charles B. Ferguson, and David S. Anderson. The emergency room is open from 5:00 p.m. to 8:00 a.m. on weekdays and 24 hours a day on weekends. These three doctors are paid $135,000 per year for their services in the emergency room. In the past, these same three doctors also operated a publicly funded clinic, physically located next door to the hospital, and received from public funds $1,000 a week for this service.
For a number of years the hospital had operated at a financial loss. On June 1, 1977, the hospital Board of Trustees employed Alvin Word, III as hospital administrator. One of Word's principal assignments was to get the hospital operating on a sound fiscal basis. However, Word "stepped on toes" and soon came into conflict with Drs. Tate, Ferguson and Anderson. This conflict culminated on April 12, 1978, when the doctors delivered to the Trustees a "him or us" ultimatum. The Board elected not to renew Word's contract. Word left the hospital when his contract expired on May 31, 1978. Insofar as the record reflects, Drs. Tate, et al. are still working at the hospital.
On June 15, 1978, William E. Watkins, one of the Defendants below and one of the Appellees here, published an editorial column in The North Mississippi Times entitled "Marshall Viewpoint". The North Mississippi Times is a weekly newspaper having its primary circulation in DeSoto County. It also has a limited circulation in adjoining Marshall County.
The commentary in question, the entire text of which is an appendix to this opinion, gave Watkins' assessment of the situation at the Marshall County Hospital. It represents Watkins' somewhat inept defense of Administrator Word whose contract had not been renewed. Watkins claimed that Word had attempted to upgrade the hospital "without asking taxpayers to foot the bill". After listing some of Word's contributions to the hospital, Watkins turned his attention to the problems he perceived. Watkins insisted that many local residents refused to use the hospital because they thought of it as a "welfare hospital".
Much of this editorial column criticized the hospital in general. Only two of eleven paragraphs refer to Drs. Tate, Ferguson and Anderson directly. In those, Watkins opined that Marshall County taxpayers were being "raked over the coals" with the emergency room operation at the hospital. He wrote:
To be guaranteed $135,000 for three internists to man the emergency room from 5:00 p.m. to 8:00 a.m. and 24 hours on weekends seems very lucrative, especially insomuch as the doctors are not at the hospital all the time but rather available for immediate response if needed.
I don't blame Drs. Robert Tate, David Anderson and Charlie Ferguson for wanting to get rid of Alvin Word, III, as *274 if I had such a good setup, I wouldn't want someone to come along and tear up my little playhouse either.
Watkins then returned to his criticism of the hospital in general. He charged improper political influence in staffing and administration. He alleged that some people in power preferred to keep the hospital operating in "the red" than to see it become a self-supporting operation. He expressed his opinion that Word had been "let go" because he tried to upgrade the hospital.
In conclusion, Watkins asked, "Do we have a bad hospital or do we have a bad county government?" He urged citizens to call the United States Department of Health, Education and Welfare and demand an investigation into alleged improprieties in the administration of the hospital.
Soon after the publication of Watkins' column, the three physician plaintiffs in this lawsuit sent a letter to Pam McPhail, editor of the North Mississippi Times. The letter advised Ms. McPhail that the doctors considered the article libelous and asked that she print a retraction. Ms. McPhail refused to do so.

B.
On September 22, 1978, Plaintiffs Tate, Ferguson and Anderson filed their declaration in the Circuit Court of Marshall County, Mississippi. Named as Defendants were William E. Watkins, the columnist who wrote the editorial column in question, Pam McPhail, the editor of the newspaper, and North Mississippi Communications, Inc., publisher of The North Mississippi Times.
The case was tried from January 6 through January 15 of 1981. At the close of the trial, the jury returned a verdict for the three plaintiff doctors, Tate, Ferguson and Anderson, in the amounts of $6,500, $5,000 and $5,000, respectively. The verdict was for compensatory damages only.
In due course the Defendants moved for judgment notwithstanding the verdict.[1] Defendants argued, among other things, that the publication in question was not libelous and, in the alternative, that the three plaintiffs were vortex public figures and hence not entitled to recover absent proof of actual malice. In connection with the hearing on the motion, the Plaintiffs admitted that they had sustained no special damages as a result of the alleged defamatory publication.
After a full hearing, the learned circuit judge on August 24, 1981, released his opinion. He vacated the judgments previously entered in favor of the three Plaintiffs and in lieu thereof entered in favor of each Plaintiff and against each Defendant a judgment for the sum of One Dollar described as "nominal damages, together with their lawful costs".[2] On the same date, final judgment was entered in accordance with the circuit judge's opinion.
The three doctor plaintiffs have perfected an appeal to this Court in which they assign as error the aforesaid action of the circuit judge. They urge reinstatement of the judgments originally entered in accordance with the jury verdicts.

C.
We need be precise about our procedural context. We have here an appeal by the three doctor plaintiffs. They urge reinstatement of the judgments originally entered in their favor in accordance with the jury verdicts. Defendants, however, have *275 not cross-appealed. Both in their brief and at oral argument they stated to the Court that they accept the final judgment that they pay each Plaintiff the sum of One Dollar plus costs.
Our only question, then, is whether the original judgments in favor of Plaintiffs should be reinstated. We examined the record and considered the arguments of counsel in order to determine whether there are grounds for reinstatement of those judgments. While many arguments have been advanced, we have found two independently dispositive, that is, two alternative reasons why as a matter of law these Plaintiffs are not entitled to reinstatement of the original judgments entered on the jury verdicts.
To be sure, these same reasons may have been adequate to enable Defendants to prevail on a cross-appeal had one been perfected. We do not reach that question, however, for Defendants have taken no cross-appeal, have stated that they consider the matter de minimis, and have said they are content to abide by the final judgment of August 27, 1981.
Though they take no cross-appeal, these Defendants-Appellees are entitled to argue, without having filed a cross-assignment of error, any grounds which are sufficient to sustain the judgment or to reject the appeal of Plaintiffs-Appellants. The grounds upon which we rely below were asserted by Defendants-Appellees in their motion for judgment notwithstanding the verdict and were fully briefed here. Plaintiffs-Appellants have fully responded to those arguments in their rebuttal brief  indeed, Plaintiffs' rebuttal brief is longer than their affirmative brief.
Without doubt the issues tendered are properly before us. Without doubt the issues have been fully and ably briefed and argued. Without doubt this matter is ripe for decision on the bases described below.

III.
We recognize at the outset that in the trial court jury verdicts were returned in favor of all three plaintiff physicians. The jury's verdict necessarily means that the jury found the Watkins' editorial commentary defamatory.
In our review of this case, and in our decision today, we have scrupulously respected our familiar rules delineating when a jury verdict may be set aside. Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657, (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478-479 (Miss. 1983). Even so, we find inescapable the conclusion that a jury has returned a libel verdict in rank disregard of the law. See also, Gulf Publishing Co., Inc. v. Lee, 434 So.2d 687 (Miss. 1983).

IV.

A.
Our threshold inquiry into matters of substance is whether the offending editorial commentary was toward these three physician plaintiffs libelous in any context.
We have repeatedly recognized the common law rule that:
Any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se.
See, e.g., Gulf Publishing Co., Inc. v. Lee, 434 So.2d 687, 695 (Miss. 1983); Natchez Times Publishing Co. v. Dunigan, 221 Miss. 320, 326, 72 So.2d 681, 684 (1954); Conroy v. Breland, 185 Miss. 787, 797, 189 So. 814, 815 (1939). See also, Restatement, Torts 2d § 559 (1977).
Two restrictions upon the action for defamation are and must be strictly enforced. First, the words employed must have clearly been directed toward the plaintiff. Beyond that, the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture.
There is no such thing as a libelous idea. Still, a defamatory communication *276 may consist of a statement in the form of an opinion. Opinion statements are actionable only if they clearly and unmistakably imply the allegation of undisclosed false and defamatory facts as the basis for the opinion. See Restatement, Torts 2d § 566 (1977).
On the other hand, nothing in life or our law guarantees a person immunity from occasional sharp criticism, nor should it. Short of becoming a hermit, no person avoids a few linguistic slings and arrows, many demonstrably unfair. It may be true that our law, quite wisely, has moved beyond the child's retort, "Sticks and stones may break my bones but words can never hurt me". Still our sensitivity to the destructive power of words hardly suggests we assess damages for all bruised feelings.
These considerations have shaped a rule of law in our "fair comment" cases. Edmonds v. Delta Democrat Publishing Co., 230 Miss. 583, 93 So.2d 171 (1957); Reaves v. Foster, 200 So.2d 453, 455-456 (Miss. 1967). Caustic commentary is simply not actionable libel.
Viewed fairly, the thrust of Watkins' commentary is an attack upon the governing authorities of Marshall County. Watkins' complaints about the way the hospital is run are directed primarily toward persons other than Drs. Tate, Ferguson and Anderson. Only two of the eleven paragraphs of the article fairly target three physicians at all.
Watkins does state that these three physicians are guaranteed $135,000 a year "to man the emergency room from 5:00 p.m. to 8:00 a.m. weekdays and 24 hours on weekends". He further charges that "the doctors are not at the hospital all the time but rather available for immediate response if needed". No one has questioned the factual accuracy of these statements.
What are challenged are two opinions offered in the same paragraph. First, Watkins charges that "Marshall County taxpayers are being raken over the coals with this emergency room operation". These words in context suggest that the primary rakers are the Marshall County government officials who agreed to pay $135,000 a year, not the physicians who contracted to receive it.
Second, the doctors are offended that Watkins describes their arrangement as "very lucrative". Here Watkins is suggesting that these doctors are being paid too much, or at least he is expressing his opinion to that effect. It is within our actual and judicial knowledge that vast numbers of our citizens think doctors' fees are too high. We have no doubt that most who think this are quite sincere in their beliefs. The medical association may have a persuasive response. In an objectively structured debate, the medical association may well have the best of the argument. Still we would appear a bit silly if we held it libelous for one to express the opinion that Dr. So-and-so's fees are too high. We are surprised that the suggestion is even made. Physicians' skins should be toughened with sterner stuff.
In the next paragraph, Watkins implies the fact that Drs. Tate, Anderson and Ferguson played a part in getting rid of hospital administrator Alvin Word, III. We find no place in the record where this fact has been denied. Rather, these doctors admit that on April 12, 1978, they submitted to the Board of Trustees a "him or us" ultimatum. There is no fact in this paragraph which could be said to be false or defamatory.
Beyond that, we find Watkins charging caustically and a bit ineptly that,
"if I had such a good setup I wouldn't want someone to come along and tear up my little playhouse either".
These words fit many descriptives: impertinent, sophomoric, ineffectual. They are an opinion Watkins had the right to express. They are not libelous.[3]

*277 B.

1.
There is a second, independent reason why the jury verdicts in favor of the three physician plaintiffs should not be reinstated. These three doctors, in First Amendment/Law of the Press terminology, were vortex public figures. In the language of the case law of this state, their activities were the subject of fair comment. Accordingly, Watkins' commentary was qualifiedly privileged. As explained below, the qualification placed on the privilege has not been violated. Indeed, the evidence is without contradiction on this point.
Freedom of the press is a fundamental requisite for the vitality of any democratic society. It is constitutionally secured in this democratic society. It is secured to William Watkins, Pam McPhail and The North Mississippi Communications, Inc. by both state and federal constitutions. In the Constitution of the United States, freedom of the press is among the rights proclaimed in the First Amendment, made binding on the states via the Fourteenth Amendment. The Constitution of this state refers to freedom of the press as a "sacred right". Miss. Const. (1890) Art. III, Sec. 13.
Seven years before the advent of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), we announced the public policy of this state in Edmonds v. Delta Democrat Publishing Co., 230 Miss. 583, 93 So.2d 171 (1957). Edmonds holds that, when a private citizen injects himself into a matter of legitimate public interest,
he invites free expression of public opinion, including criticism. When such criticism is in the form of an opinion, relates to public assertions or acts rather than to the individual and his private affairs, is fair in the sense that readers can understand the factual basis for the opinions contained in the criticism, and the publication relates to a matter of public interest, then the occasion is conditionally privileged; no action will lie for such publication no matter how severe the criticism or unfavorable the comments if the privilege is not abused. [Emphasis added]. 230 Miss. at 590-591, 93 So.2d at 173.
Under Edmonds the qualification on the privilege was that the words must not have been uttered out of malice. 230 Miss. at 591-592, 93 So.2d at 174. Whether the Edmonds qualification has been here violated need not detain us for the definition of malice in this context has been authoritatively announced in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Liability may not be imposed for otherwise actionable libel of a public figure unless the statements in issue were:
"made with knowledge of their falsity or in reckless disregard of whether they are true or false". 379 U.S. at 78, 85 S.Ct. at 217, 13 L.Ed.2d at 135.
The Sullivan definition of malice, derived from the First Amendment, has been accepted and enforced repeatedly by this Court. See, e.g., Reaves v. Foster, 200 So.2d 453, 458-459 (Miss. 1967); Gulf Publishing Co., Inc. v. Lee, 434 So.2d 687, 695 (Miss. 1983).
Our inquiry then is whether Drs. Tate, et al, are "public figures", for if they are, they cannot recover absent proof of actual malice on the part of defendants.
These three physician plaintiffs hold no public office. Yet within Edmonds there is the liberal concept of the quasi-public figure, one who though otherwise a private figure becomes active or involved in a matter of public concern. Further, there is within the Sullivan doctrine the recognition of the vortex public figure. Such a person is one who is otherwise a private figure but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest. Gertz v. Robert Welch, Inc., 418 U.S. 323, 351, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789, 812 (1974). A quasi- or vortex public figure must prove *278 actual malice when he brings a defamation action arising out of the matter of legitimate public interest. In all other aspects of his life, he remains a private figure whom some argue can recover with a lesser degree of proof or culpability on the part of the defendant.
We emphasize that the matter of legitimate public interest need not produce actual controversy. It is enough that the matter is in the public domain. Any person who becomes involved, voluntarily or involuntarily, in any matter of legitimate public interest  and this certainly includes the method of administration of any program of services financed in whole or in substantial part by public monies  becomes in that context a vortex public figure[4] who is subject to fair comment.

2.
Before applying these principles to the facts of this case, we need to make clear the current state of our law. Several of our post-Sullivan cases[5] have continued to apply separately the fair comment doctrine Edmonds and progeny and the constitutionally based public figure/actual malice standards of Sullivan. Having considered well both doctrines, we regard it beyond debate that the Sullivan doctrine has for the most part subsumed  and broadened (in the direction of further shielding the press from libel liability)  our fair comment cases.[6]
Whereas, Edmonds, et al, arguably protected only commentary, the Sullivan doctrine protects commentary, opinions as well as statements of fact.
Whereas Edmonds defines malice in terms of a state of mind, Sullivan imposes a more objective test[7]  actual knowledge of the defamatory character of words or reckless disregard thereof.
On the other hand, we regard the definition of a quasi-public figure in Edmonds  the Edmonds vortex public figure, if you will  as broader than that found in Sullivan *279 and Gertz. Nothing in Sullivan or Gertz requires that we more restrictively define the Edmonds vortex public figure. Similarly, nothing in the law of this state or its public policy suggests such.
Consequently, we hold that under the law of this state all otherwise actionable utterances  commentary, opinion or fact  made regarding a public figure or a vortex public figure are qualifiedly privileged. The qualification on the privilege is that the person defamed may yet recover if he proves that at the time of the utterance the defendant either
(a) knew clearly that the utterance was false, defamatory and otherwise actionable, or
(b) acted in reckless disregard of whether it was false, defamatory and otherwise actionable.
This rule is a part of the positive law of this state. It is grounded in our Constitution which declares that "the freedom of speech and of the press shall be held sacred". Miss. Const. (1890) Art. III, § 13. It has been foreshadowed by the liberal spirit of Edmonds and Reaves. Because it is consistent with the Constitution of the United States and the Sullivan doctrine, we may enforce it.

3.
The only task that remains, then, is to apply this rule to the facts presented here.
The subject matter of Watkins' column was the operation of the Marshall County Community Hospital. This hospital was built with public monies under the old Hill-Burton plan. In substantial part it is operated with public funds, both through direct appropriations via the Marshall County Board of Supervisors and indirectly through funding of public insurance programs known as Medicare and Medicaid. Beyond that, the Marshall County Hospital is the only hospital serving the residents of that county. It is the nerve center of the county's health care delivery system. Without more, the operation of the hospital is a matter of legitimate public interest.
Alvin Word, III, hospital administrator, was the center of controversy within the hospital and county government generally.[8] He instituted efficiency programs that rankled the medical staff, including the three plaintiffs. He discharged three medical assistants. The matter culminated when Drs. Tate, et al., issued their ultimatum to the Board of Trustees: him or us. Even if they had not theretofore been public figures, the three doctors at that moment became vortex public figures.[9] As such under the rule of law articulated above, these three doctors have no right of recovery here absent proof by clear and convincing evidence of actual malice on the part of Watkins and the other defendants. Based upon our careful review of the entire record, we hold that there is not the slightest iota of proof of actual malice on the part of Watkins and the other defendants. Indeed, we do not understand plaintiffs to argue to the contrary. Accordingly, these plaintiff physicians are not entitled to reinstatement of the jury verdicts rendered in their favor.[10]

*280 V.
There is a broader context. All readers of this opinion should read in its entirety the editorial column written by William E. Watkins upon which this action has been predicated. It is within the actual and judicial knowledge of this Court that newspapers around this country each year print hundreds of editorial columns equally as caustic and cynical with no one ever dreaming of filing suit.
One can pick up the editorial page of almost any newspaper in the country any day of the year and find commentary arguably "worse" than this. Commentators from Jack Anderson to Hunter S. Thompson to William F. Buckley, Jr., to Murray Kempton differ from William E. Watkins not in the verve of their editorial verdicts but only in the articulate style in which they express them.
If plaintiffs' construction of the First Amendment had been in effect over the years, we are confident no one today would ever have heard the name of H.L. Mencken, or in this state of Frederick Sullens, of Hodding Carter or of P.D. East  with the consequence that we may have come to take ourselves too seriously.
AFFIRMED.
PATTERSON, C.J., WALKER, P.J., and PRATHER and SULLIVAN, JJ., concur.
ROY NOBLE LEE, P.J., and DAN M. LEE, J., specially concur.
BOWLING, HAWKINS and DAN M. LEE, JJ., dissent.
*281 
*282 ROY NOBLE LEE, Presiding Justice, specially concurring:
In my opinion, the editorial "Marshall Viewpoint" written by the appellee, William E. Watkins, simply does not libel the appellants, regardless of their positions, and I would decide the case on that narrow issue.
I am in full accord with Paragraph V of the majority opinion and I concur with the result finally reached in that opinion, e.g., that the judgment of the lower court be affirmed.
DAN M. LEE, J., joins this opinion.
BOWLING, Justice, dissenting:
This dissenting opinion should have an attractive title, as all ordinary working people should be made aware of what this Court is now doing to them. An appropriate title might be "Citizens Beware  Especially Doctors!"
Although, as hereinafter discussed, the majority opinion affects every citizen of the state, this particular case affects the medical profession and the good name and reputation of physicians. Stated another way, it affects how that good name may be kept and how it may be taken away without recourse. The medical profession is much concerned with so-called malpractice claims. In my humble opinion, it should be just as much concerned with the inability to protect the individual from not having recourse for defamation which will result from the majority opinion.
This writer does not have the eloquence to state properly the value of what is being taken away. I therefore borrow a statement from Shakespeare's "Othello" where he said:
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.
In my humble opinion, the situation that will result after the majority opinion is published will be as bad as any that appears in the jurisprudence of this state or any other state. Realizing this is a hard statement, I am now on the spot to justify it.
The majority opinion basically is in two parts; (I) the article in question was not libelous and (II) the three doctors involved were "vortex public figures" and their good name could be besmirched without recourse unless actual malice on the part of the wrongdoer could be established.
A threshold fallacy that appears clear to me is that the judgment of one dollar under either one of the theories propounded by the majority opinion just cannot stand  neither could a judgment of one penny, one schilling or even a blade of grass. Under either majority theory, the verdict has to be "zero". I hasten to say that I have read the part of the opinion which states that there was no cross appeal, but it is clear that the opinion is reversing and holding completely for appellees, even without using the excuse of "plain error" as provided in Mississippi Supreme Court Rule 6(b).
The first of the two part opinion under Number IV-A, in making a definite finding that the article in question was not libelous, ends with these words:
These words fit many descriptives: impertinent, sophomoric, ineffectual. They are an opinion citizens had a right to express. They are not libelous.
Again, in my humble opinion, proper legal writing requires that the opinion end there. I agree that the article is not libelous. I agree in what the opinion in effect says; that is, we are holding completely for appellees. If the article is not libelous, as hereinbefore discussed, appellants were not entitled to one thin dime and we should say so without a lot of fancy words and render the cause here under the plain error rule, stating that the lower court should have reduced the judgments to zero instead of one dollar.
The first part of the opinion specifically holding that the article was not libelous in any instance, whether against appellants as *283 public figures, private citizens, doctors or nincompoops, should end the case and end the opinion. Why go ahead and add a law journal article on the relationship between persons accused of writing libelous material against individuals and those individuals.
Why the author of the majority opinion chose, for some reason unknown to this writer, to go ahead and change the law of libel is beyond my comprehension. The case was over.
As the majority evidently has agreed to go the extra mile on a mere legal discourse, I am required to answer that part of the opinion.
Every member of the bar with any experience is familiar with the so-called taking over of the law of libel and slander by the federal courts. This, as indicated in the majority opinion, began with the famous case of New York Times, Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). This opinion basically held that libelous accusations against a "public official" were not actionable unless actual malice on the part of the utterer could be proven or a reckless disregard for whether or not the charges were true. There have been a number of United States Supreme Court cases since Sullivan, supra. The principal ones being St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 70 L.Ed.2d 262 (1968); Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Time, Inc. v. Firestone, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976); Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); and Wolston v. Readers' Digest Association, Inc., 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).
After Sullivan, which was confined to "public officials", Curtis Publishing Co. v. Butts, supra, came along and extended the immunity to certain "public figures." A study of those cases reveals that the federal court has relaxed over the years its strict construction of a "public figure." Butts, supra. I stop here and call attention to the fact that the majority opinion in the case sub judice goes backward from Sullivan, supra, instead of forward, as do the subsequent cases hereinbefore cited.
The majority opinion extends the right to libel a person, if in some manner it can be said he is a "vortex public figure." With deference, a stupid grammarian such as I can read the cases and see that there is no such term. I do not find that word used in any of the cases except in one instance in Gertz, supra, where in talking about the plaintiff Gertz, the court said: "He plainly did not thrust himself into the vortex of this public issue, nor did he engage the public attention in an attempt to influence its outcome." I have checked Webster's largest dictionary and the nearest definition I can find of the word "vortex" is:
Hence, figuratively: a. A state of affairs characterized by rapidity of change, constant excitement, or the like; sometimes a rapid round of activities. b. Something that draws or tends to draw one with compelling or irresistible force.
With the definition of "vortex" in the dictionary and as mentioned in Gertz, supra, the term refers to a condition surrounding a situation rather than defining a person. What the majority opinion is doing, in addition to carrying the law of libel back to the dark ages, is to invent a new term to further erode the rights of a person to protect his good name and reputation.
Mr. Justice Powell in Gertz, supra, [referred to in the majority opinion] said:
The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name "reflects no more than our basic concept of the essential dignity and worth of every human being  a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual *284 States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system." Rosenblatt v. Baer, 383 U.S. 75, 92, 15 L.Ed.2d 597, 86 S.Ct. 669 [679] (1966) (concurring opinion).
As noted in the quote and in all the cases hereinbefore cited, the United States Supreme Court is now leaving the libel and slander immunity question largely in the hands of individual states. No longer may this Court state, as was stated in 1967 by a prominent member, now deceased, that "the federal courts have pre-empted the field of libel and slander ..." The author of the majority recognized this in his opinion and attempted to justify the excision of the rights of the doctors in question as well as other citizens of this state by relying on three cases: Edmonds v. Delta Democrat Publishing Co., 203 Miss. 583, 93 So.2d 171 (1957); Reaves v. Foster, 200 So.2d 453 (Miss. 1967); and NAACP v. Moody, 350 So.2d 1365 (Miss. 1977). We shall not rehash these cases in detail, but contend with all earnestness that they do not apply in the present case under the circumstances resulting in appellants being "public figures" whether "vortex" or not. Even if it could be said that reliance on the above three Mississippi cases is permissible, the majority opinion stretches the immunity against the individual beyond the United States Supreme Court cases relied on previously by this Court and admittedly controlling in what this Court has said.
To further emphasize the role of the state court in present day libel and slander actions and the fact that this rule should not be applied in the manner as set out in the majority opinion, we quote further from Gertz, supra, where Mr. Justice Powell, for the Court, stated:
We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.
In Time, Inc. v. Firestone, supra, in discussing the term "public figure" for the purpose of the First and Fourteenth Amendment, the Court reiterated Gertz, by saying:
For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.
In Hutchinson v. Proxmire, supra, the plaintiff was in a similar position as appellants in the case sub judice. It was contended that he was a "public figure" because he was a director of research at a state mental hospital operated by the State Department of Mental Health and had "vortexed" himself to a position of authority in mental health research. The lower court fell for this contention but received a resounding reversal. The United States Supreme Court stated, through Chief Justice Burger:
Since New York Times Co. v. Sullivan, [citations omitted], this Court has sought to define the accommodation required to assure the vigorous debate on public issues that the First Amendment was designed to protect while at the same time affording protection to the reputations of individuals.
Again, the law elsewhere is going forward and we are going backward.
At the risk of undue length, the following quote from the recent case of Wolston v. Reader's Digest Assn., Inc., supra, sums up the jurisprudence regarding libel and slander of "public figures" by saying
In New York Times Co. v. Sullivan, [citations omitted] the Court held that the First and Fourteenth Amendments prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct absent proof that the statement was made with "actual *285 malice," as that term is defined in that opinion. See also St. Amant v. Thompson, 390 US 727, 731, 20 L.Ed.2d 262, 88 S.Ct. 1323 [1325] (1968). Three years later, the Court extended the New York Times standard to "public figures". Curtis Publishing Co. v. Butts, 388 US 130, 162, 18 L.Ed.2d 1094, 87 S.Ct. 1975 [1995] (1967) (Warren, C.J., concurring in result). But in Gertz v. Robert Welch, Inc., 418 US 323, 344-347, 41 L.Ed.2d 789, 94 S.Ct. 2997 [3009-3010] (1974), we declined to expand the protection afforded by that standard to defamation actions brought by private individuals. We explained in Gertz that the rationale for extending the New York Times rule to public figures was twofold. First, we recognized that public figures are less vulnerable in injury from defamatory statements because of their ability to resort to effective "self-help". They usually enjoy significantly greater access than private individuals to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements. [citations omitted]. Second, and more importantly, was a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have "voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them" [citations omitted]. We identified two ways in which a person may become a public figure for purposes of the First Amendment:
"For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." 418 U.S. at 345, 41 L.Ed.2d 789, 94 S.Ct. 2997 [at 3009].

CONCLUSION
It is amazing and almost unbelievable to me that the majority of this Court would join in an opinion that reached up into thin air and pulls down a brand new legal term and interprets that term to destroy the rights of Mississippi citizens. Some say that Mississippi is last in a lot of things  it is now first in permitting the news media and other entities to have an unbridled right to ruin good reputations.
The opinion written for the majority extends the immunity of libelers and slanderers to the furtherest point that has ever been gone by any court in any state or country. The saddest part is that there is absolutely no need to even invent the term "vortex public figure" and then use that term as it is now being used. As hereinbefore set out, the disposition of this case was made before the term was invented. The opinion ignores the admonition of Chief Justice Berger in Hutchinson, supra, when he said for the Court, "Our practice is to avoid reaching constitutional questions if a dispositive non-constitutional ground is available."
All the appellant doctors did was to operate the emergency room of a federally funded hospital. They took part in a controversy between the hospital administrator and the Board of Trustees. In my humble opinion, I believe that members of hospital staffs have a right to express their opinions. The majority opinion states:
Any person who becomes involved voluntarily or involuntarily in any matter of legitimate public interest  and this certainly includes the method of administration of any program of services financed in whole or in part by public monies becomes in that context a vortex public figure, who is subject to fair comment.
and
Having considered both doctrines [Sullivan and Edmonds] we regard it beyond debate that the Sullivan doctrine has for *286 the most part, subsumed  and broadened [in the direction of further shielding the press from libel liability]  our fair comment cases.
I have been to far removed, for too long a time, from the academic field to really understand the contention about the Sullivan doctrine "subsuming" our fair comment cases. However, I still can read and a reading of the cases hereinbefore discussed just makes the statement "not so." The Sullivan doctrine did not even deal with "public figures", only "public officials". Furthermore, subsequent cases, as cited, "subsume" the Sullivan doctrine.
The above quotes include almost every person who walks the streets of this state or has a job to earn a livelihood for his or her family. A large number of people now days are in some way involved in "programs of services financed in whole or in part by public monies". Carrying the position of appellants further, it is easily seen that all members of their profession who take part in medicaid and medicare programs, are involved in "programs of services financed in whole or in part by public monies" and according to the majority, are helpless to protect their good name and reputation. Taking the hypothetical further, what about a house builder who will receive his final payment from a federal agency after building a house that is inspected regularly by that agency through the use of public funds.
We could go on and list innumerable situations that the "brand new libel and slander law" now being adopted would grant an unbridled license to the news media and other entities and give the citizen absolutely no right of recourse.
In my humble opinion, not even the news media of this state wants the legal situation set up in the uncalled for Part II written for the majority. At whatever risk is involved, I personally want the citizens of this state to know what is being done to them.[1]
I would concur that the article in question is not libelous and would render the cause giving a complete judgment to appellees under Rule 6(b) of this Court. I reiterate the title suggested for this dissent at the outset, that is, "Citizens Beware  Especially Doctors!"
HAWKINS and DAN M. LEE, JJ., join in this dissent.
NOTES
[1] At trial there was a fourth plaintiff (not a physician) in whose favor the jury had also returned a verdict. During the pendency of the motions for j.n.o.v., all claims of that plaintiff were settled out of court. We proceed here as though this fourth plaintiff had never been a party to this action.
[2] The trial judge held that the utterance in question was libelous per quod and not per se. It is generally agreed that a plaintiff may not recover for libel per quod in absence of proof of special damages. Here the plaintiff-physicians stipulated that they had sustained no special damages. In this context, the trial judge held that each plaintiff was entitled to recover nominal damages only and reduced the judgment in favor of each to One Dollar.
[3] There is much sound and fury in the briefs over whether Mississippi recognizes a distinction between libel per se and libel per quod, and, if so, the contours and effects of the distinction. Because we do not regard the utterance here in issue libelous in any context, we do not reach that issue.
[4] The concept of the vortex public figure, of course, is nothing new in our law. Edmonds v. Delta Democrat Pub. Co., 230 Miss. 583, 93 So.2d 171 (1957). The term originated in Gertz v. Welch, supra, and has since been employed by both federal and state courts. Steaks Unlimited, Inc. v. Deaner, 468 F. Supp. 779, 784 (W.D.Pa. 1979); Velle Transendental Research Association v. Sanders, 518 F. Supp. 512, 515 (C.D.Calif. 1981); A.H. Belo Corp. v. Rayzor, 644 S.W.2d 71, 83-84 (Tex. App. 1981). In the context of the facts of the case at bar, as well as the legal concepts which we are here concerned, the term is both accurately descriptive and practicably useful. c.f. Edmonds v. Delta Democrat Pub. Co., 230 Miss. 583, 591, 93 So.2d 171, 173-74, (1957).
[5] Five post-Sullivan cases have been decided by this Court whose facts lent themselves to the application of both privileges. Neither the rationale nor the results have always been consistent.

Reaves v. Foster, 200 So.2d 453 (Miss. 1967) held that a pamphlet calling a high school principal insulting names was privileged both as fair comment and because the plaintiff had failed to prove actual malice. However, Pride v. Quitman Co. Voters League, 226 So.2d 735 (Miss. 1969), held that, even though police officers were public figures, a leaflet accusing them of specific instances of police brutality was not privileged because it was not commentary. (It was admitted that the comments were made with knowledge of their falsehood.) In Arnold v. Quillian, 262 So.2d 414 (Miss. 1972), a man who had called a highway patrolman a lying, thieving son of a bitch was held liable for slander because he had acted in bad faith, even though neither privilege was mentioned. Five years later, however, NAACP v. Moody, 350 So.2d 1365 (1977) held privileged a letter accusing a highway patrolman of a specific instance of police brutality because the plaintiff was a public figure and failed to prove actual malice. Finally, in an earlier case, Perkins v. Miss. Publishers Corp., 241 So.2d 139 (1970), the Sullivan privilege shielded from liability a newspaper that had published a photograph of the plaintiff's campaign poster in the midst of a pile of weapons.
A combined reading of these cases suggests the need for the clarifying statements made above.
[6] In Reaves v. Foster, 200 So.2d 453 (Miss. 1967), Justice Jones was only slightly off mark when he wrote:

"The federal courts have pre-empted the field of libel and slander ..." 200 So.2d at 458.
[7] As explained in Reaves v. Foster, 200 So.2d 453 (Miss. 1967), Sullivan holds:

"that hatred, ill will, enmity, intent to harm of negligence are insufficient to establish malice . .." 200 So.2d at 458.
[8] Plaintiffs argue vehemently that the administration of the hospital is not a matter of legitimate public interest because "no one cares who the hospital administrator is". The point is that Watkins and The North Mississippi Times have every right to suggest, sans Sullivan-style actual malice, that the public ought to care because their tax dollars are being used to fund the operation of the hospital. In the present context, it matters not whether the "controversy" in fact existed before publication of the offending editorial commentary or was created by it.
[9] It should be emphasized that we do not find these doctors to be vortex public figures merely because of their profession. Each of the doctors is a public employee at a public hospital. Watkins criticized these doctors in the context of the controversy concerning their public employment. If Watkins had actually libeled these doctors in the context of their private lives or businesses, our holding might well have been different.
[10] We emphasize our holding in Section IV(A) above that the utterance in question is simply not libelous. Our alternative holding in this Section IV(B) is that, assuming arguendo that the words uttered may have been libelous, these plaintiffs may not recover because they are vortex public figures who have not proved actual malice.
[1] As has frequently been happening the past year or so, after the dissenting opinion of this writer was filed, the opinion written for the majority was "doctored" in an attempt to benefit the doctors. The reason for this addition to my dissent is to emphasize that the doctors should not expect any benefit from the "doctored" opinion written for the majority, as the same situation prevails as in the original opinion.