# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-IA-00651-SCT

*SIMMONS LAW GROUP, P. A. AND HEBER S. SIMMONS, III*

*v.*

*CORPORATE MANAGEMENT, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/27/2009 |
| TRIAL JUDGE: | HON. KATHY KING JACKSON |
| COURT FROM WHICH APPEALED: | GREENE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | ALEXANDER FREDERICK GUIDRY |
| | DANNY ALTON DRAKE |
| ATTORNEYS FOR APPELLEE: | JACKYE C. BERTUCCI |
| | JOHN R. REEVES |
| | DARREN E. GRAY |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 08/19/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRAVES, P.J., DICKINSON AND CHANDLER, JJ.**

**GRAVES, PRESIDING JUSTICE, FOR THE COURT:**

¶1. Corporate Management, Inc. (CMI) is a private hospital and nursing home administrator that managed the Greene Rural Health Center (GRHC), the public hospital and nursing home in Greene County. CMI sued Greene County Board of Supervisors and others for breach of contract when the Greene County Board of Supervisors purported to terminate CMI's contract to manage GRHC. The Greene County Board of Supervisors retained Heber Simmons and Simmons Law Group (hereinafter collectively referred to as "Simmons") as

defense counsel. Shortly after a motion hearing in the breach-of-contract suit, the *Hattiesburg American* published an article about the motion hearing, which included an out-of-court statement Mr. Simmons had given. The article, in relevant part, read:

> "This is a prime example of why the Medicare situation in the state and across the country is in the shape it is," Simmons said. "CMI is sucking these facilities dry. That money is coming out of the pockets of the people laying in those beds, their families and Medicare."

¶2. CMI then filed the present action against Simmons alleging that Mr. Simmons' statement published in the *Hattiesburg American* was defamatory against CMI. Simmons moved for summary judgment, arguing that CMI is a vortex public figure, and CMI cannot prove by clear and convincing evidence that Mr. Simmons' alleged defamatory statement was made with actual malice, which a plaintiff who is a vortex public figure[1] must prove in a defamation suit. The trial court denied Simmons' motion for summary judgment, and Simmons then filed the instant interlocutory appeal with this Court. We find that the trial court erred in denying Simmons' motion for summary judgment, because CMI did not proffer evidence upon which a reasonable jury could make a finding that Mr. Simmons made the statement with actual malice.

## FACTS AND PROCEDURAL HISTORY

¶3. In April 2005, CMI contracted to manage GRHC. Later that year, the Greene County Board of Supervisors purported to terminate the CMI contract. CMI then sued the Greene County Board of Supervisors and others for breach of contract. *See **Greene County v.***

---

[1]"Such a person is one who is otherwise a private figure but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest." ***Ferguson v. Watkins***, 448 So. 2d 271, 277 (Miss. 1984).

2

*Corporate Mgmt., Inc.*, 10 So. 3d 424 (Miss. 2009). The Greene County Board of Supervisors retained Heber Simmons and Simmons Law Group as defense counsel.

¶4. Prior to the Greene County Board of Supervisors retaining Simmons, James Aldridge, a former administrator of GRHC, provided a sworn statement about his experience working for CMI at GRHC.[2] Aldridge's testimony included the following:

> Quest Medical is owned by Corporate Management, Incorporated. It is the medical supply company for all the medical facilities that they operate.
> Quest Rehab is an independent rehab company that provides basically occupational therapy, speech therapy, physical therapy. . . .
> . . . .
> Seeking competitive prices and services was really never an option. It was always mandated that we will buy from Quest Medical. . . .
> . . . .
> I was told from day one basically that we buy all of our medical supplies from Quest Medical and we use rehab services through Quest Rehab, that was not an option, that was just the way it is. We own these companies. . . .
>  . . . .
>  . . . [Starann Lamier, C.O.O. of CMI] said, "You always get the Quest Medical bids first, then you find higher ones than Quest Medical, so we can always buy from Quest Medical."
> . . . .
> I could have bought straight from the vendor or I could have bought from a multitude of other people that sell that same product; however, per the mandate that was issued to me by StarAnn Lemear [*sic*], okay, buying from another company besides Quest Medical was not an option unless Quest Medical did not offer the same product.
> . . . .
>  . . . [The GRHC Board of Trustees] had done some research and discovered that the RFP [i.e., request for proposal] was 3,000 or $3500, that you had to get multiple bids over $3500. Well, I was freaking out because I was told by Miss Lemear [*sic*] that it was $15,000. And so I started calling – I called Miss Lemear [*sic*], I said, "What do you want to me do about all of this stuff that we bought that was over $15,000?" She said, "I want you to go back and get multiple bids." I said, "Well, we've already purchased them and some

---

[2] Simmons believes Aldridge's statement was given in connection with a potential lawsuit Aldridge was going to bring or has brought against CMI.

of this equipment is already in the building." And she said, "Go back and get backdated quotes."

. . . .

[A] majority of the time [Quest was] not the lowest. . . . 90 percent of the time.

. . . .

There was quite a bit of self-dealing going on besides the purchasing of the medical supplies through Quest Medical, which is owned by Ted Cane, CMI. They also own – "they," Ted Cane, CMI, also owned a corporate company called Quest Rehab Services. They provide physical therapy, occupational therapy, speech therapy to the residents of the hospital and/or nursing home. They are directly housed in the hospital in an old Operating Room 1. They are on-site basically eight hours a day, five days a week.

And how the money trail sort of goes is because in a critical access hospital, okay, you are not making a huge profit. You want to keep your cash flow up. So Corporate Management, StarAnn Lemear [*sic*], had instructed me to get patients from the nursing home brought over to the hospital and admitted to one of our three beds. And to keep three in it at all times so that they could get rehab services, we could buy medical supplies from their company, and we also could keep a cash flow going for the hospital in order to meet payroll and pay some of the leases that we had initiated.

Well, if a patient needs to go to a hospital legitimately, that's fine, they come through the emergency room, the doctor decides whether or not they need to be admitted to one of the three rooms.

In the very beginning, we were at a[n] occupancy rate of around 33 percent, which is one room out of three being filled. I was ordered by StarAnn Lemear [*sic*] and Terry Beard, and so was Miss Hunt, to find patients from the nursing home, to have them transferred over to the hospital to use their swing bed days.

. . . .

Patients are characterized by two different stays. Medicare patients have 100 days available to them through the emergency room and then end up in the swing bed for 100 days.

. . . [There were unnecessary hospital admissions being accomplished under the policies that Starann Lamier discussed with me,] 100 percent. . . . I would say upwards to 85 percent of all hospital admissions in the beginning were inappropriately obtained.

. . . .

. . . I had this case come up in late July, you know, where an individual was admitted, the 100 days were used. The patient wasn't really sick. He was eating, doing good, talking, that whole nine yards. And we sent him back to the nursing home after we used his 100 days, got somebody else in. The patient became sick and needed to go back on swing bed. Well, you have to

4

have a 60-day wellness period in between hospital stays in order to regenerate the 100 days again. So if he goes into the hospital, which he did, he had to pay a large amount of money for that service, and that's when it really became apparent to me what was going on.

¶5. Evidence of CMI's self-dealing and improper practices was also revealed in a court-ordered report prepared by a CPA, comparing the cost of items purchased by GRHC, while CMI was managing GRHC, with the cost of the same items purchased at other hospitals. The court-ordered CPA report explained in part:

> 2. Analysis of purchases by GRHC Nursing Home and Hospital from CMI affiliates.
> . . . .
> b. Detailed invoices provided by CMI in support of the above data were provided to two local hospitals with instructions to randomly provide comparative costing for like items. Pricing lists from three different medical supply distributors were used in this comparison. . . .
> 1. For this sampling process 161 samples were taken that resulted in an average markup of 74% in prices paid by GRHC facility from CMI affiliates compared to the 3 distributors.
> . . . .
> 3. Further research of the 161 samples was performed through comprehensive internet research by the undersigned's office with the results being similar to those of the two hospitals.
> 4. An array of the 161 samples is as follows:

| Number of Samples | Markup rates as paid by GRHC over 3 distributor prices |
|---|---|
| 2 | CMI affiliates had better prices by 4% and 12% on the two invoices |
| 11 | Distributor prices better by less than 5% |
| 148 | Distributor prices better by 9% to 367% |
| 161 | |

> 5. All sampling and comparison of prices relate to purchases from Quest Medical Services affiliate.

6. In addition to the sampling discussed above, another sampling was conducted by the undersigned where one out of every 15 purchases, taken from CMI invoices, was priced using internet sources. This was an attempt to insure pure random selection. Results of this sampling was an average 70% increase price paid by GRHC thru CMI affiliates over prices paid on the open market.

. . . .

8. Similarly, there are large amounts of travel billings in the Quest Rehab invoices which raises the question of whether in-house services might be less expensive.

9. Observed from the Quest Pharmacy invoices is $21,276 of consulting services while a full time pharmacist is on the GRHC staff.[3]

¶6.     At a trial-court motion hearing in the breach-of-contract suit brought by CMI –

*Corporate Management, Inc. v. Greene County* decided by this Court in *Greene County v.*

*Corporate Management, Inc.*, 10 So. 3d 424 (Miss. 2009) – Mr. Simmons explained:

> . . . [The financial records CMI finally produced show] that on average they are paying a 74 percent markup from cost to its own subsidiaries for the same products and goods that can be obtained on the open market.
>
> . . . .
>
> . . . And that's coming straight through, and it's coming out of GRHC's operating budget. On top of that, we're paying [CMI] a management agreement of 25 grand a month.
>
> So [CMI is] making it on the management agreement for managing the facilities. GRHC is paying the employees not CMI, and on top of that every product or service coming in is coming through [CMI's] own subsidiaries, and we're paying a 75 percent markup. That's what these financial records have shown. . . .
>
> . . . .

_____

[3] CMI points out that the court-ordered CPA report also stated:

. . . Whether all of the items purchased were necessary for a three bed hospital is beyond the capability of the undersigned and would be best answered by a medical expert experienced in these matters.

. . . .

There is a potential error in any sampling process, as there may well be in the above data. Because of time constraints, this sampling was not accomplished in a textbook manner that would be used by a professional statistician. Nonetheless, the results indicate that GRHC facilities are paying a significantly higher price for medical supplies from CMI affiliates than could be obtained on the open market.

. . . The light of day has shown on the circumstance. The people of this County need to know this and more importantly if they are going to argue that they are entitled to continue under a management contract that takes 15 percent of gross revenue that jumps up to roughly a million five a year. This facility will not survive that. They are sucking everything out, and they want more, and the fraud issue, which concerns me the most, can be answered by that. . . .

¶7.    Shortly after the motion hearing, and shortly before a special election in which Greene County voters were to decide who would operate GRHC, the *Hattiesburg American* published an article about the motion hearing.[4][5] The article, which included an out-of-court statement Mr. Simmons had given directly following the hearing, read in pertinent part:

> CMI purchases nearly all of the supplies, medications and services it uses through three wholly-owned subsidiaries: Quest Medical, Quest Rehab and Quest Pharmacy. Simmons said that these entities purchase the supplies, services and medicines on the open market and mark them up an average of 74 percent when they are sold to the Greene Rural Health Center. Many of the charges are as much as 200 percent higher than open market prices.
> Simmons said that in addition to management fees and mark-ups, CMI also receives an additional $21,000 annual consulting fee through Quest Pharmacy, on top of paying more than $100,000 per year to a part-time pharmacist.
> . . . .
> Particularly troubling to Simmons is that CMI was ordered three times by the court and finally held in contempt before providing any financial information. Nor did CMI provide regular financial information to the GRHC trustees.
> "This is a prime example of why the Medicare situation in this state and across the country is in the shape it is," Simmons said. "CMI is sucking these

---

[4] CMI has pointed out that the *Hattiesburg American* reporter was sitting in the courtroom during the motion hearing, and a portion of his article repeated what Mr. Simmons had said during the hearing.

[5] Greene County citizens voted 1,750 to 893 to turn over operation of GRHC to George Regional Health System, rather than have CMI continue its operation of the facility. This fact would be relevant if the defamation-claim element of "special harm" were at issue, but that element is not at issue.

facilities dry. That money is coming out of the pockets of the people laying in those beds, their families and Medicare."

¶8. On March 7, 2008, CMI filed the instant defamation suit against Simmons. Simmons moved for summary judgment, and after a hearing on March 19, 2009, the trial court entered an Order denying Simmons' motion. The trial court reasoned:

> Even with the allegations of the defendant [Simmons] regarding the action of the plaintiff [CMI], the plaintiff has brought forth evidence in support of its position that the statements of the defendant were not based in fact. Because of the conflict in the proof offered by these opposing parties, it is obvious that there is an issue of fact present that should be submitted to a jury for resolution.

Notably, the trial court did not find that CMI brought forth sufficient evidence in support of its position that Mr. Simmons had made the statement with actual malice (i.e., with knowledge that it was false or with reckless disregard of whether it was false or not). As explained below, malice is an essential element of a defamation claim when the plaintiff is a vortex public figure, like CMI. ***Moon v. Condere Corp.***, 690 So. 2d 1191, 1196-97 (Miss. 1997).

## DISCUSSION

¶9. This Court reviews grants or denials of summary judgment *de novo*. ***O.W.O. Invs., Inc. v. Stone Inv. Co., Inc.***, 32 So. 3d 439, 446 (Miss. 2010). Further, this Court has explained:

> The trial court "shall" grant a summary judgment motion "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). Summary judgment is appropriate if the nonmoving party has not made a sufficient showing to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of

8

proof at trial." *Kuiper v. Tarnabine*, 20 So. 3d 658, 661 (Miss. 2009) (quoting *Smith ex. rel. Smith v. Gilmore Mem'l Hosp., Inc.*, 952 So. 2d 177, 180 (Miss. 2007)).

*O.W.O. Invs., Inc.*, 32 So. 3d at 446. In addition, this Court has stated:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
>
> . . . .
>
> The appropriate summary judgment question [in the instant case] is whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.

*Franklin v. Thompson*, 722 So. 2d 688, 692 (Miss. 1998).

¶10.    To establish a defamation claim, an ordinary plaintiff must show:

> (1) a false and defamatory statement concerning the plaintiff;
> (2) an unprivileged publication to a third party;
> (3) fault amounting at least to negligence on the part of the publisher; and
> (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.
>
> Where the defamed party is a public figure, however, such party is prohibited from recovering damages unless that party proves that the statement was made with actual malice – that is, with knowledge that it was false or with reckless disregard of whether it was false or not.
>
> This Court has held that private individuals who become "limited purpose" or "vortex" public figures may also be subjected to this "malice standard of proof." Such a person is one who is otherwise a private figure but who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest.
>
> . . . .
>
> . . . Any person who becomes involved, voluntarily or involuntarily, in any matter of legitimate public interest – and this certainly includes the method of administration of any program of services financed in whole or in substantial part by public monies – becomes in that context a vortex public figure who is subject to fair comment.

9

*Moon*, 690 So. 2d at 1195-96 (internal quotations and citations omitted). When the defendant in a defamation case is a vortex public figure, "a person's ill will or personal spite will not, standing alone, support a finding of actual malice. . . . [T]he evidence must show that [the defendant] made a false publication with a high degree of awareness of . . . probable falsity, or must have entertained serious doubts as to the truth of his publication." *Franklin*, 722 So. 2d at 692 (internal quotations and citations omitted). Evidence of negligence is not sufficient to establish actual malice. *Moon*, 690 So. 2d at 1196.

¶11. At the March 19, 2009 hearing on Simmons' motion for summary judgment, CMI admitted it was a "vortex" public figure, stating:

> No. No, we have an obligation to correctly advise the Court legally and we're doing that. It was a public issue that had been in the public domain, i.e., whether or not to change management of the hospital. Public dollars were being spent on it so I think, you know, legally, they were a vortex public – they were brought into the public fray by that. But, so, our standard is to prove that he acted with reckless disregard for the truth or actual malice.

¶12. Thus, the issue is whether the trial court erred by finding that CMI's evidence, taken as true, could support a reasonable jury finding that Mr. Simmons acted with actual malice.[6]

¶13. According to the precedent discussed above, in order to succeed in its defamation claim, CMI, as a vortex public figure, must prove by clear and convincing evidence that Mr. Simmons' statement was made with actual malice – i.e., with knowledge that the statement

---

[6] Simmons also argues that the trial court erred by finding that CMI's evidence was sufficient under Mississippi Rule of Civil Procedure 56 to create a genuine issue as to whether Simmons' statement was based in fact. Because we find that CMI did not proffer evidence sufficient to create an issue of fact as to whether Mr. Simmons made the statement with actual malice – and because such a finding would mandate the granting of Simmons' motion for summary judgment – the question of whether CMI's evidence created an issue of fact regarding the truthfulness of the statement need not be addressed.

was false or made with reckless disregard of whether it was false or not. *Moon*, 690 So. 2d

at 1195. *See also Franklin*, 722 So. 2d at 692 (explaining that actual malice exists when the

statement was made with a high degree of awareness of the statement's probable falsity or

with serious doubts as to its truth). CMI has not presented sufficient evidence to support

such a finding. The only evidence that CMI presented in response and opposition to

Simmons' motion for summary judgment was an affidavit of Starann Lamier, which stated:

> 1. . . . I am the Chief Operating Officer of Corporate Management, Inc. (CMI).
>
> 2. CMI provides management services to Quest Rehab, Inc., Quest Medical Services, Inc., Quest Pharmacy, Inc., LTC Consulting, and Stone County Hospital, Inc.
>
> 3. Mr. Cary Williams' [i.e., the court-appointed CPA's] analysis of CMI's actions is unfounded and without merit and untruthful.
>
> 4. Mr. Heber Simmons['] allegations of fraud and misappropriation of funds are untruthful.
>
> 5. CMI did not purchase any items for Greene Rural Health Center.
>
> 6. All charges for equipment, supplies and/or services provided by CMI, Quest Rehab, Inc., Quest Medical Services, Inc., Quest Pharmacy, Inc., LTC Consulting, and Stone County Hospital, Inc. were [*sic*] to Greene Rural Health Center were usual and customary charges and did not deviate from what those companies charged any other customer.
>
> 7. The statements made by James Aldridge regarding any type of purchasing practices or price manipulations under taken [*sic*] by the above mentioned entities are totally false.
>
> 8. Remarks by Mr. Aldridge are retaliatory in nature and in complete contrast to previous statements made while Mr. Aldridge was employed by Greene County. In fact, Mr. Aldridge as facility Administrator was completely in charge of all start-up aspects or re-opening the Greene County Hospital. He and his staff personally picked and ordered every supply and piece of equipment necessary to open and continue operations of the facility. The remarks by Mr. Aldridge occurred after he was terminated by Stone County Hospital, Inc. for egregious violations of company policy and an express directive from superiors not to confront employees who made allegations against Mr. Aldridge.
>
> 9. Mr. Simmons' remarks were made with malice and with the intent to damage CMI's reputation in the community just before an election was to be held concerning CMI's continued operation of the facility known as GRHC.

11

We find that this affidavit alone could not support a reasonable jury finding that CMI had shown by clear and convincing evidence that Mr. Simmons' statement was made with actual malice. *See Franklin*, 722 So. 2d at 692.

¶14. As this Court held in *Moon*, reliance on information that later is proven untrue rises only to the level of simple negligence, not malice. *Moon*, 690 So. 2d at 1196. Thus, even if the statements in Lamier's affidavit were to be proven true, that would not prove that Mr. Simmons knew the information upon which he based his statement was false at the time he made the statement nor that he made the statement with reckless disregard of whether it was false or not. *See Moon*, 690 So. 2d at 1195. As Simmons argues, "CMI's proof, even taken as admissible, probative, and true, only goes to prove that today there might be some small doubt that what Simmons said could possibly be false."

¶15. Therefore, we find that CMI failed to proffer evidence upon which a reasonable jury could make a finding of actual malice, an essential element of CMI's defamation claim. Accordingly, we find that there is no genuine issue of fact as to the element of actual malice, and the trial court erred in failing to grant Simmons' motion for summary judgment. *See Glover ex. rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1274 (Miss. 2007) (". . . the court must grant summary judgment unless – as to each material issue of disputed fact raised by the moving party – the record demonstrates at least the minimum quantum of evidence sufficient to justify a determination in favor of the non-moving party by a reasonable juror." (footnotes omitted)); *Williams v. Bennett*, 921 So. 2d 1269, 1272 (Miss. 2006) ("Where the summary judgment evidence establishes that one of the essential elements of the plaintiffs'

12

cause of action does not exist as a matter of law . . . all other contested issues of fact are rendered immaterial." (internal quotations and citations omitted)).

## CONCLUSION

¶16.    In summary, we find that CMI failed to proffer evidence upon which a reasonable jury could make a finding of actual malice, an essential element of its defamation claim. Accordingly, we find that the trial court erred in failing to grant Simmons' motion for summary judgment, and would reverse and render in favor of Simmons.

**¶17.    REVERSED AND RENDERED.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, KITCHENS AND CHANDLER, JJ., CONCUR. PIERCE, J., NOT PARTICIPATING.**