# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00367-COA

**BRIAN S. POPE**                                       **APPELLANT**

**v.**

**DEBORAH BAIRD MARTIN A/K/A DEBORAH**          **APPELLEE**
**L. MARTIN A/K/A DEBORAH MARTIN POPE**
**A/K/A DEBORAH L. POPE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/23/2020 |
| TRIAL JUDGE: | HON. DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | C. DALE SHEARER |
| | IAN AUSTIN |
| ATTORNEY FOR APPELLEE: | MATTHEW ALLEN BALDRIDGE |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 01/10/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1. Brian Pope filed a civil action against his stepmother, Deborah Martin, in the Rankin County Circuit Court, alleging defamation and violations of state and federal wiretapping laws. The Rankin County Circuit Court granted summary judgment in favor of Deborah on all claims. Brian appealed, asserting that (1) the trial court erred when it granted summary judgment without a hearing and without issuing any findings of fact and conclusions of law; (2) the trial court erred when it granted summary judgment in favor of a party resisting discovery; (3) summary judgment was improper on his defamation claim; and (4) summary

judgment was improper on his wiretapping claims. We find no error in the trial court's decision to forego a summary judgment hearing, to decline to issue findings of fact and conclusions of law for its summary judgment determination, or to grant summary judgment amidst the parties' discovery disputes. Nor do we believe summary judgment was improper on the defamation claim. But because the record does not contain sufficient evidence to assess the propriety of summary judgment on the wiretapping claims, we reverse and remand to the trial court with instructions to remedy the record and properly assess the wiretapping claims for summary judgment.

## FACTS AND PROCEDURAL HISTORY

### I.      Background

¶2.    In 1997, when Brian was thirty-five years old, his father George "Bill" Pope married Deborah. The couple was married for nineteen years until Bill's death in 2016. In 2011 Bill was diagnosed with cancer. He also suffered from diabetes and progressive heart-valve failure. His cancer was treated with surgery and radiation in 2012. In the summer of 2015, Bill was diagnosed with an additional type of cancer, for which he received chemotherapy in July, August, and September of that year. These combined ailments, along with their complications, necessitated many doctor visits and hospital stays. On February 5, 2016, Bill was transferred from MD Anderson Cancer Center in Houston, Texas, to Merit Health River Oaks Hospital in Flowood, Mississippi, for his final hospital stay. Bill lost his battle with cancer on February 12, 2016.

¶3.    Bill's last will and testament apparently provided that each of his beneficiaries

(Deborah and his four children Brian, William Pope, Barry Pope, and Alissa Marodis) should receive twenty percent of his estate. Bill's estate was probated in the Rankin County Chancery Court. The administration of the estate appears to have contributed to some animosity between Deborah and Brian.

## II.     Lawsuit Against Deborah

¶4.     On February 9, 2018, Brian filed a complaint in the Rankin County Circuit Court against his stepmother, Deborah—litigation that would persist in the circuit court for the next three years. Brian's complaint contained three claims: (1) a federal Wiretap Act violation; (2) a Mississippi Wiretap Act violation; and (3) defamation.

¶5.     In support of his federal and state wiretapping claims, Brian's complaint alleged that on February 9, 2016, during his father's final hospital stay, Brian discovered a small, black device "next to one of the sofa legs" in his father's hospital room. Upon further inspection, Brian determined that the device was a USB recorder that had been recording conversations in the hospital room.

¶6.     Upon leaving the hospital, Brian took the device with him. Using his computer, he determined that the device held thirty-two audio recordings. Brian's complaint stated that many of the recordings were dictations of Deborah's thoughts, but others were recordings of oral conversations in her home and in Bill's hospital room. In his complaint, Brian self-transcribed excerpts from many of these recordings to support his wiretapping claims.

¶7.     Brian's complaint contained transcriptions of multiple conversations between Deborah and other parties on various dates. But his interrogatories only specified the purported

Federal Wiretap Act violations as those instances "pleaded in Paragraphs 7-8, 16 and 22 to 27 of the Complaint." These paragraphs correspond to two specific dates where Brian maintained the recorded conversations were actionable (i.e., when he was present and Deborah was not a party to the conversation)[1]: August 29, 2015, and February 9, 2016. Brian's affidavit confirms his focus was solely on these two dates. The August 29, 2015 recordings took place in Bill and Deborah's home. According to Brian's pleadings, the conversation began with Bill, Brian, and Deborah conversing together, and then "Deborah left the room for twenty minutes, leaving me alone with my dad while her [USB device] recorded our private conversations." The February 9, 2016 recordings occurred when Deborah was absent from Bill's hospital room. This was the same day Brian found the USB recorder.[2] These hospital-room recordings, according to Brian, began at approximately 8:00 a.m. Brian stated that Deborah left shortly thereafter and that the recorder picked up private conversations between Brian, his siblings, and Bill, until Brian found the USB recorder around dinner time on February 9, 2016. Notably, Brian admitted that he had transcribed the portions of the recordings from the USB device that were found in his complaint and affidavit. Brian's self-produced transcripts described Deborah's presence in the hospital room at various points on the day of February 9, 2016. Because Brian failed to enter the recordings into the record or to have certified or sworn copies of transcriptions entered, it

---

[1] Brian acknowledges in his pleadings that he "does not make any claim that [Deborah] violated the law by recording conversations when she was in the room."

[2] The USB device contained files organized by the dates of recordings. Each file was broken down and saved into multiple recordings, so each date had its own "set" of recordings.

was unclear how long Deborah was actually present or absent on either August 29, 2015, or February 9, 2016.

¶8.    Brian's third claim against Deborah was for defamation.  Brian alleged that Deborah sent a defamatory email[3] on December 5, 2017, to a Rankin County Chancery Court administrator.   The email from Deborah consisted of the following message:

> **Subject**:    Re: attorney fees & GWP IRA distribution correction Case No. 2016-002312
> **Date**:    Tue, 5 Dec 2017 02:46:46 -0600 (CST)
> **From**:    DEBORAH MARTIN ≤debbill1@comcast.net≥
> **Reply-To**:    DEBORAH MARTIN ≤debbill1@comcast.net≥
> **To**:    wbpope@twc.com, Brian Pope <ketzelkat@yahoo.com>, Alissa <alissapm@gmail.com>, lstringer@rankincounty.org
>
> I think the latest round of "fees" being charged the Pope Estate should be reviewed by Judge Grant.   He knows the inflated charges game put on clients so I want the next round of charges to be approved by Judge Grant first before any more funds are paid out.  If more legal work was in the future, it should have been detailed in statement and submitted with the $50K, Young Wells, Williams received just last week.  Judge Grant reduced the outrageous legal fees charge the Pope estate by $16K, so he saw something curious just as I did!!!
>
> Since I have been trying to get the IRA bond distribution explanation for almost 2 years, I wish for you to find out the answer and submit to the office of Judge Grant.
>
> I was supposed to get 20% of Bill's IRA just like the other 4. The bragging Morgan Stanley said they did this kind of stuff all the time with clients.  Well, if you remember it was a mess. Totally disorganized.  The whole place was totally disorganized the day we were in the Morgan Stanley office.   It was a

---

[3] Brian briefly mentioned at least two other derogatory emails in his pleadings, but the emails themselves are not included in the record.  Brian's focus appeared to be on the email sent to the chancery court administrator, as that was the only email listed in the defamation section of Brian's complaint.

5

FIASCO. On March 4, 2016 we had to sign that we accepted the prepared individual IRA distribution chart of Bill's IRA bonds and cash. The GWPope Morgan Stanley IRA bonds & cash were transferred in April 2016. The total ending value of The GWP IRA in March 2016 was **$3,201,572.62 to be divided 5 ways**.

**Morgan Stanley divided up the bonds and cash in the 15 page asset distribution & the results were: Debby $711,110; Alissa 710,397; Bradley $712,290; Brian $713,238; Barry $712,242.**

My $711,110 MS estimate - $655,169 in GWP IRA bonds & CASH created a shortage of $55,941. Therefore the other 4 beneficiaries should have had a similar figure. We were all on the same time table so the excuses thrown at me that the bonds fluctuate is B.S. The other 4 beneficiaries MS account summary should reflect a close figure to $55,941 shortage of funds to reach their MS bond distribution chart amount. None of you would produce the evidence to verify I received my 20% so this would have to be intentional planning. I want figures confirming what the other 4 received from the GWP IRA in bonds and cash and submitted to Judge Grant. I believe the 4 beneficiaries got funds within +/- $4000 of their 15 page MS GWP IRA Bond distribution list. Bottom line is the 4 of them were withing =/- $4k of their MS figures, I was off $55,941 but that has been denied research!! At the hearing that did not happen, I was told by Don Goode of Young Wells Williams that I would have to sue Morgan Stanley to get this money owed me from the GWP Will. Well, how timely that advise was. I told Bradley of this discrepancy several times but he did nothing. Privacy laws are all well and good but not at the expense that I cannot get my 20% inheritance. That is criminal. I also told all the attorneys I contacted for help on my case to be advocates for me in solving this discrepancy but they also did nothing. There were no differences in the 6 Morgan Stanley accounts. We were all under the same software information for calculations and on the same time schedule. The lame excuses I was told that it is a privacy issue and I cannot know or confirm I got my 20% inheritance per the GWP Will is criminal. Paper copy of email to be sent to Barry Pope.

Deborah Martin

Brian's complaint asserted that the language regarding "'intentional planning' and that their actions were 'criminal'" were defamatory statements by Deborah that injured his reputation. Brian propounded his request for admissions, interrogatories, and request for production of documents shortly after filing his complaint.

¶9.     On May 17, 2018, Deborah filed her answer and counter-claim against Brian for conversion of her USB recorder.  Deborah's defenses to the wiretapping claim, fleshed out in later pleadings, were that (1) she was a party to the recorded conversations; (2) if she was not a party to the conversation, her husband Bill was a party, and he gave his consent to being recorded by Deborah; (3) she never intended to record Brian; and (4) Brian had no reasonable expectation of privacy in Deborah's marital home or in Bill's hospital room.  In response to the claim for defamation, Deborah's defenses were (1) that the statement was true (2) and that the email was privileged as related to a judicial proceeding, therefore unactionable. Later in the action, she claimed that Brian had put forth no evidence he was injured by the email, as defamation requires.  Deborah also moved to strike some of the transcribed portions of the complaint as being immaterial, scandalous, and unrelated to the action.   She propounded her interrogatories, requests for production, and requests for admissions to Brian on the same day.

### III.    Discovery Disputes

¶10.    On June 8, 2018, Deborah sent her first set of discovery responses to Brian.  On July 9, 2018, Brian submitted his answer in response to Deborah's counter-claim against him for

7

conversion of the USB recorder. He also filed his response in opposition to Deborah's motion to strike portions of the complaint, explaining that the portions she sought to strike were related to malice and were material to a punitive-damages claim. Brian submitted his first set of responses to interrogatories on July 18, 2018.

¶11. A year later, after the circuit court clerk's notice of potential dismissal for want of prosecution, Brian filed his first motion to compel discovery, alleging that Deborah submitted insufficient responses to a great number of his written discovery requests. Deborah filed a motion to compel discovery on November 15, 2019, mainly requesting Brian be required to produce the USB recorder, which had been in his possession for three years at that point. Both parties supplemented their discovery in November 2019. On January 29, 2020, Brian next filed an amended motion to compel discovery, still arguing that Deborah's identification of recording devices and recordings was insufficient. The hearing regarding the amended motion took place on February 12, 2020.

¶12. The trial court judge, displeased with the discovery squabbles, informed the parties that he would give them an opportunity to walk outside and come to an agreement on discovery. The judge informed the parties that they would be fined $150.00 per item that he had to rule on because they could not agree. The judge stated, "I imagine . . . when they realize it's $150 per lick, they'll probably start agreeing on some things. I have no problem refereeing discovery, but it's going to come at a price for both sides."

¶13. Before the parties met in the hall, however, the trial court heard arguments on the motion to strike portions of the complaint. The trial court determined that since the

complaint would not come before the jury, there would be no need to strike portions of the complaint. Next, the trial court heard arguments regarding why the USB recorder had not been produced by Brian. Brian noted that Deborah had not asked for a copy of the recordings, but she had asked for the recorder itself. Brian argued that he could not "give [Deborah] the only evidence we have in the case." The trial court judge explicitly told Deborah, "You're entitled to a copy of the recording. I'm not sure they've got to give you the device." The trial court then asked the parties to agree on an expert to turn it over to, splitting the cost of expert transcription.

¶14. Then the parties were asked to "[s]tep out in the hall, see if you can work the rest of it out"—which they did. After a brief recess, Brian's attorney told the trial court that the parties agreed to "reserve a few things for down the road." He stated that Deborah agreed to supplement some discovery answers. He also stated that the parties "agreed . . . that the recordings they have and the recordings we have will be submitted to an IT expert to pull them off and, for their purposes, help identify which ones they claim are privilege and which are not and, for our purposes, simply make them a copy and verify where they came from and that kind of thing."

¶15. An order denying the motion to strike portions of the complaint was entered on February 25, 2020. An agreed order reflecting the specifics of the parties' agreements regarding the motion to compel was entered on the same day. The agreed order did not, however, reflect an agreement to submit the recordings to a special master. The order mentioned only that "[Deborah] will supplement her response thereto to produce all

9

recordings (whether audio or video) that she made of Brian Pope. Defendant will make that supplemental response within thirty (30) days of entry of this Agreed Order. The parties shall each bear half of the third-party costs necessary to produce such recordings . . . ."

¶16. On June 1, 2020, Deborah propounded her second set of interrogatories and requests for production to Brian. This time, Deborah specifically requested that Brian "produce any recording in your possession taken by [Brian], including every recording on the subject USB disk recorder." Both parties submitted additional discovery in the following months. According to Brian's own pleadings, Deborah made her first production of recordings, producing "a storage device containing the eight referenced recordings" copies of the recordings she identified on her computer (redacted for purposes of privilege). She also submitted a detailed amended privilege log with the recordings. Brian did not submit copies of his recordings.

### IV.   Summary Judgment

¶17. On September 21, 2020, Deborah filed a motion for summary judgment. In the exhibits attached to the motion, Deborah included Brian's first and second responses to discovery requests, the table of recordings she produced, and the alleged defamatory email. She also attached her affidavit, which claimed that Bill (a party in every recording in question) gave his consent to being recorded. The affidavit stated that she and Bill purchased the recording device together with the intent to use it for reminders and errands. She said that Bill also used the recording device for reasons such as making to-do lists. Additionally, Deborah stated, "[D]ue to Bill's declining health, Bill asked me to and additionally gave me

10

permission to record him and to record doctor's visits so we could remember the instructions doctors and/or nurses gave us." She stated that Bill would tell her to "sit there and record." Deborah supported this claim by submitting a May 23, 2015 recording where Bill said to her at a doctor's office, "No, you don't, just be quiet and sit there and record . . . ."

¶18. On October 16, 2020, Brian submitted a motion to strike the portion of Deborah's affidavit regarding Bill's consent as hearsay. He also filed his response in opposition to the motion for summary judgment. Brian attached to his response only his own affidavit and affidavits of his siblings Alissa and William.

¶19. Alissa's affidavit established that she was not aware of the recording and that their father never told them that he consented to any recordings. Alissa also mentioned that during the private conversations that occurred in the hospital room, the room's door was kept closed, and the staff knocked and announced themselves when entering the room—thus giving the family privacy during those times. William's affidavit supported these facts and added that Deborah knew she received approximately the same amount of bonds from the IRA distribution as the other beneficiaries, and therefore she knew that no one intentionally tried to deprive her of her share of Bill's IRA. Finally, Brian also expressed in his affidavit the lack of consent to being recorded. He stated that his father never told him about being recorded or about his consent to being recorded. Brian also re-submitted large portions of the self-transcribed excerpts from the USB recorder. He stated in his affidavit, "I listened to the recording with those monologues from the [USB recorder] and made this true and

11

correct transcription directly from that recording, and was there for what else occurred."[4]

¶20.    Brian then filed a second motion to compel discovery, again alleging that there were additional recording devices and recordings that Deborah had not produced.[5]  Hearings were set for Brian's motion to strike and his second motion to compel.  Next, on October 27, 2020, Brian made a motion for an evidentiary hearing,[6] requesting that he be allowed to play the recordings on the USB device for the court, particularly in light of the upcoming summary judgment hearing, which was set for November 25, 2020.

¶21.    On November 4, 2020, Deborah filed her response in opposition to striking portions

---

[4] Brian's and William's original affidavits that were attached to the response in opposition to the motion for summary judgment had not been sworn to and subscribed before a notary public.  On October 19, 2020, Brian filed amended affidavits that were properly notarized the same day.

[5] Upon reading Deborah's responses and supplementary responses to Brian's interrogatories and requests for production as listed in this motion, it does not appear that Deborah's responses refer to any additional recording devices or recordings.  Deborah initially stated in her answer to Interrogatory No. 10 that she had an inoperable older recording device she could not locate. Her supplementary interrogatory answer stated that these two devices (the older device and the device in Brian's possession) were the only two devices that contained recordings of Brian.  Deborah's second supplementary responses stated that she located the second, older device and placed it in her attorney's possession. This response clearly stated that "there are two recording devices." Deborah's interrogatories stated the older device "at one point . . . did have a recording with Brian Pope on it," which she identified in her second supplemental responses to Brian's interrogatories.  Yet Brian, in his second motion to compel discovery, alleged "Martin identified three recording devices" and "the collective effect of Martin's three responses to Interrogatory No. 10 is to leave unclear how many total recording devices she has identified." Deborah has explicitly and repeatedly identified two devices: one that was inoperable and one that was in Brian's possession.  But Brian continues to insist that additional recording devices or recordings exist.

[6] Brian filed an amended motion for an evidentiary hearing the following day, October 28, 2020, which specifically referenced the upcoming summary judgment hearing.

of her affidavit as hearsay, arguing that the recorded statement and affidavit portions that she submitted were (1) not hearsay, as they were not offered to prove the truth of the matter asserted; and (2) even if they were hearsay, they would be excepted by Mississippi Rule of Evidence 803(3) as a "then-existing mental, emotional, or physical condition" since they shed light on Bill's intent to be recorded.[7] On the same day, she filed a motion to strike Alissa's, Brian's, and William's affidavits. In particular, she attacked Brian's affidavit as

> consist[ing] entirely of transcriptions [Brian] made himself of alleged recordings on the recording device in his possession. Plaintiff has not produced these recordings, these transcriptions have no indicia of reliability, and they are inadmissible hearsay under Miss. R. Evid. 801 and 802. [Brian] is transcribing out-of-court statements offered for the truth of the matter asserted. [Brian's] statements are also self-serving in that [Brian] has seemingly interpreted these recordings in the light that most benefits him, with no evidence to support his transcriptions . . . . He has also failed to serve the sworn or certified copies of the recordings he references as [he is required to attach to his affidavit] by Miss. R. Civ. P. 56(e).

¶22. On November 4, 2020, Deborah also filed a rebuttal in support of her motion for summary judgment, a response in opposition to Brian's second motion to compel (in which she claimed she had given Brian all copies of recordings and had identified all recording devices), and a response in opposition to Brian's requested hearing for evidence. Her final filing on that day was a motion to compel discovery and for sanctions against Brian for failing to provide copies of the recordings. Deborah noted in her motion that the trial court had ruled at the February 2020 hearing regarding Brian's first motion to compel that she was

---

[7] "A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." MRE 803(3).

13

entitled to the recordings.[8] She sought sanctions from the trial court on the ground that Brian had never produced the recordings that she had repeatedly requested.

¶23.    On November 17, 2020, after a flurry of filings in the preceding days in rebuttal to Deborah's many motions, Brian filed a response to Deborah's motion to compel production of the recordings, stating that "discovery . . . is ongoing."  He explained that during the February 12, 2020 hearing, the parties agreed to the use of a special master, and the trial court requested that they "agree on an expert to turn [the USB recorder] over to."  Brian explained that the parties had exchanged drafts for a proposed agreed order appointing a special master but had not yet agreed on a draft.  Brian stated that he sent the last proposed draft order appointing a special master to Deborah on July 23, 2020, and that she had not responded.  As a consequence, Brian argued, he still had not produced the recordings—even though when he filed his response, the summary judgment hearing was set for eight days away (on November 25, 2020).

¶24.    On November 18, 2020, Brian sent the trial court a letter reminding the court of the pending motions prior to the summary judgment hearing set for November 25, 2020—i.e., the motion for an evidentiary hearing at which Brian could play the recordings, the motion

---

[8] Deborah refers to the trial court's directive from the February 12, 2020 hearing, where the trial judge stated, "[Y]ou're entitled to a copy of the recording" and referred to it as an "order." It is not clear that this statement can be construed in that way. The agreed order issued after the February 12, 2020 hearing only ordered, generally, "Defendant will make that supplemental response within thirty (30) days of entry of this agreed Order. The parties shall each bear half of the third-party costs necessary to produce such recordings. . . ." Regardless, the trial judge did state that Deborah should receive a copy of the recordings, and Deborah explicitly requested the recordings in discovery on June 1, 2020.  But the recordings were never produced.

to strike portions of Deborah's affidavit as hearsay, and his second motion to compel.

¶25. On November 23, 2020, two days before the summary judgment hearing, the trial court's staff attorney emailed the parties and stated that a hearing would not be necessary, as "Judge Arthur has reviewed the filings in this matter" and found summary judgment should be granted. A bare-bones order granting summary judgment was issued the same day.

¶26. On December 3, 2020, Brian filed a motion to alter the judgment or to state the facts and conclusions upon which summary judgment was based. The trial court denied the motion to alter the judgment on March 8, 2021, in an order reminding Brian that "Rule 56 summary judgment is not an action tried upon the facts without a jury so as to trigger Rule 52 applicability, therefore, findings of fact are unnecessary."

¶27. Brian filed his notice of appeal one month later. On May 24, 2021, however, he filed a motion with the trial court to set aside its order granting summary judgment, asserting fraud under Mississippi Rules of Civil Procedure 60(b)(1) and 60(b)(6).[9] In his motion to set aside judgment, Brian continued to argue that Deborah had not produced all recordings and recording devices. He argued that the court should vacate the judgment under rule 60(b)(1) because Deborah hid evidence relevant to Brian's claims and her defenses during discovery.[10]

¶28. A hearing was held on September 8, 2021, regarding Brian's motion to set aside the judgment under Rule 60(b). Brian's attorney again requested to play the recordings for the

---

[9] This additional filing, along with a motion by Deborah for attorney's fees, caused the preparation of the appellate record to be put on hold, though the record preparation resumed at a later date.

[10] A thorough review of the responses to discovery from Deborah gives no indication that she was hiding recorders or recordings or that she failed to produce evidence.

15

benefit of the court, but the court refused to "expand the record" following the prior grant of summary judgment. After this refusal, Brian argued that Deborah hid and obstructed evidence in the case, constituting reversible fraud under Rule 60(b)(1) or Rule 60(b)(6). Brian's examples of fraud were that (1) Deborah said there was no privacy in the hospital room and that doctors did not knock before entering, but according to Brian the recordings showed otherwise; and (2) Deborah misstated the date that Bill gave consent at the doctor's office, misquoting the year.[11]

¶29. The trial court judge, after reminding Brian's attorney that Brian had possession of the recordings in question, turned to the topic of the merits of Brian's wiretapping claim. The trial judge questioned Brian regarding his theory that Brian had a reasonable expectation of privacy in Deborah's home, expressing disbelief that a person could be liable in tort for scenarios where a Ring doorbell filmed a person or if a nanny cam was mistakenly left recording.

¶30. From the bench the trial judge stated the following in support of the order granting summary judgment:

> At the end of the day, what the Plaintiff had before this Court, this Court didn't believe that the wiretapping statute that he cited in Mississippi was an actionable tort. There were no damages. It's a garden variety claim that's raised in almost every single divorce case in this state. And, quite frankly, this Court granting that going forward would just open up the floodgates of litigation for people who are unhappy with their results in chancery court.

---

[11] Brian's motion asserting fraud on the court stated that May 23, 2015, was a Saturday, an unlikely day for a doctor's appointment. The motion also alleged that because Deborah said in the recording that it was Thursday and because May 23, 2013, was on a Thursday, "[Deborah] had to know the statement was not true," and thus her fraud was evident.

16

Bottom line is many of these claims involved what was going on in the Deceased's hospital room, what was going on in the Defendant's home. This Court just didn't see where that was actionable.

On the defamation claim, the Court felt like, assuming everything about his allegations were true, it didn't expose him to public hatred, contempt or ridicule or degrade him in society. Simply stated, this Court doesn't believe that comments or statements made to a Court's - - to a Judge's court administrator are statements made to the public. It's a statement made to an agent of the judicial branch of government. And, quite frankly . . . . If every negative comment made to [the court administrator] was actionable, this Court would be filled up with claims about claims about claims. Bottom line, the Court just didn't see that there was a claim after all the discovery was done, so the Court granted summary judgment.

¶31. The trial judge reminded Brian that the court was not required by law to give finding of facts and conclusions of law in an order on summary judgment under Rule 56 before denying Brian's motion to set aside the judgment under Rule 60(b) in a ruling from the bench. On September 23, 2021, the trial court entered an order denying the motion to set aside the judgment and denying requests for sanctions and attorney's fees. After this final order was entered, the requisite documents were transmitted on appeal.

**STANDARD OF REVIEW**

¶32. "The standard of review for summary judgment motions is de novo." *United States Fid. & Guar. Co. of Miss. v. Martin*, 998 So. 2d 956, 962 (¶12) (Miss. 2008) (citing *Germany v. Denbury Onshore LLC*, 984 So. 2d 270, 275 (¶15) (Miss. 2008)). This Court "examines all the evidentiary matters before it—admissions in pleadings, answers to interrogatories, depositions, affidavits, etc., . . . [which] must be viewed in the light most favorable to the party against whom the motion has been made." *McCullough v. Cook*, 679 So. 2d 627, 630 (Miss. 1996) (citing *Mantachie Nat. Gas Dist. v. Miss. Valley Gas Co.*, 594 So. 2d 1170,

17

1172 (Miss. 1992)). "The trial court's decision regarding summary judgment will be affirmed if the record before the trial court shows that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law." *Martin*, 998 So. 2d at 962 (¶12).

## ANALYSIS

### I.  Summary Judgment Without a Hearing and Trial Court's Decision to Forego Findings of Fact and Conclusions of Law

¶33.  Brian argues that the trial court procedurally erred when it granted summary judgment without a hearing and without issuing any findings of fact and conclusions of law under Mississippi Rule of Civil Procedure 52.  Based on well-established precedent, we determine that the trial court did not err in these matters.

¶34.  Caselaw has explicitly stated that there is no right to a hearing on a summary judgment motion.  The Mississippi Supreme Court has held, "Rule 56 of the Mississippi Rules of Civil Procedure neither explicitly nor implicitly provides the right to a hearing on a motion for summary judgment." *Tunica County v. Town of Tunica*, 227 So. 3d 1007, 1026 (¶46) (Miss. 2017) (citing *Adams v. Cinemark USA Inc.*, 831 So. 2d 1156, 1162 (¶34) (Miss. 2002), *superseded by* M.R.C.P. 78).  Motion practice, which generally is governed by Rule 78, no longer implies a right to a hearing on a summary judgment motion.  *Id.*

¶35.  Furthermore, it is well established that Rule 52's requirement that a judge "shall upon the request of any party . . . find the facts specially and state separately its conclusions of law," M.R.C.P. 52(a), does not apply to summary judgments under Rule 56.  As Rule 56's advisory committee notes state:

18

> A trial court need not make findings of fact when ruling on a motion for summary judgment because "a Rule 56 summary judgment hearing is not an action 'tried upon the facts without a jury' so as to trigger Rule 52 applicability."

M.R.C.P. 56 advisory committee notes (quoting *Harmon v. Regions Bank*, 961 So. 2d 693, 700 (Miss. 2007)). Brian was informed of the holding in *Harmon* by the trial court in its March 8, 2021 order denying his request to make additional findings and conclusions under Rule 52. He has produced no new caselaw that indicates a change in this well-established rule. We find that these assignments of error are without merit.

## II. Resisting Discovery and Moving for Summary Judgment

¶36. Brian next asserts the trial court erred when it granted summary judgment in favor of Deborah because he claims she was resisting discovery. Here, again, the trial court was not in error.

¶37. Brian repeatedly has insisted that Deborah improperly resisted discovery by failing to give him additional recorders and recordings. Deborah claims that she divulged all of the equipment and recordings that she has in her possession. Our Supreme Court has found that parties should not "resist[] discovery on the one hand and mov[e] for summary judgment on the other." *Smith v. H.C. Bailey Cos.*, 477 So. 2d 224, 234 (Miss. 1985). Although this may be true, if Brian believed that more time was needed to further compel Deborah in discovery matters prior to summary judgment, the proper remedy was to file a Rule 56(f) motion.[12] *Id.*

---

[12] Mississippi Rule of Civil Procedure 56(f) (when affidavits are unavailable) states:

> Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a

at 232-33 (citing *Smith v. Cmty. Fed. Sav. & Loan Ass'n of Tupelo*, 77 F.R.D. 668 (N.D. Miss. 1977)). Brian, however, failed to file a Rule 56(f) motion to allow the trial court to assess whether more time was needed for discovery in his case.

¶38. Furthermore, "[t]rial courts are afforded broad discretion in discovery matters, and this Court will not overturn a trial court's decision unless there is an abuse of discretion." *Ashmore v. Miss. Auth. on Educ. Television*, 148 So. 3d 977, 981 (¶9) (Miss. 2014). A review of the record does not indicate that Deborah was resisting discovery. In fact, it appears that she answered every discovery request Brian propounded, although not to his satisfaction. Because there is no indication that the trial court abused its discretion in this matter, we find that the trial court did not err in granting summary judgment amidst the parties' discovery disputes.

### III. Summary Judgment on the Defamation Claim

¶39. Brian next argues that the trial court erred by granting summary judgment on his defamation claim. He specifically argues that (1) the purported defamatory email was not a pleading in a judicial matter and had no relation to the legal proceedings in chancery court; and (2) the words "intentional" and "criminal" in the email were clear and unmistakable. We disagree and find that summary judgment was proper on this claim.

¶40. The Supreme Court has listed the elements of defamation as follows:

(1) a false and defamatory statement concerning another;

---

continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such order as is just.

M.R.C.P. 56(f).

(2) an unprivileged publication to a third party;

(3) fault amounting at least to negligence on the part of the publisher; and

(4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Chatham v. Gulf Pub. Co.*, 502 So. 2d 647, 649 (Miss. 1987) (citing Rest. (2d) of Torts § 558 (1977)).

¶41.    The threshold question in a defamation claim is whether the alleged statement was defamatory, "for if the statement was not defamatory, little else matters." *Fulton v. Miss. Pubs. Corp.*, 498 So. 2d 1215, 1216 (Miss. 1986) (citing *Ferguson v. Watkins*, 448 So. 2d 271, 275 (Miss. 1984); *Gulf Publ'g Co. Inc. v. Lee*, 434 So. 2d 687, 694 (Miss. 1983)). "Subject to our normal standards, the question whether said-to-be-offending words are defamatory may be decided by the Court without submission to the trier of fact." *Perkins v. Littleton*, 270 So. 3d 208, 216 (¶26) (Miss. Ct. App. 2018) (citing *Lawrence v. Evans*, 573 So. 2d 695, 697 (Miss. 1990)).

¶42.    In *Fulton*, our Supreme Court held:

> In determining whether a statement is defamatory, we recognize the common law rule that [a]ny written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se.

*Fulton*, 498 So. 2d at 1217 (quoting *Ferguson*, 448 So. 2d at 275). Moreover, "the words used must have been clearly directed at the plaintiff [and] the defamation must be clear and unmistakable from the words themselves and not the product of innuendo, speculation or conjecture." *Id*. "If the reader must struggle to see how and whether they defame, by

21

definition the words are not defamatory in law." *Lawrence*, 573 So. 2d at 698. "Words which may be found defamatory only with the aid of 'a most vivid imagination' are not actionable." *Id.* (citing *Fulton*, 498 So. 2d at 1217). Finally, "[t]he said-to-be-offending words must be set in the context of the entire utterance. Their complexion draws color from the whole." *Id.*

¶43. In the present case, the defamatory words are not sufficiently clear. Upon a plain reading of the email from Deborah to the court administrator, it appears that Deborah's critiques are directed at Morgan Stanley, the company distributing the IRA account, not Bill's children. As Deborah states in her email, "[t]he bragging Morgan Stanley said they did this kind of stuff all the time with clients." To ascribe Deborah's use of "criminal" as a defamatory word to Brian, given the full context of this email, requires a reader to "struggle to see how and whether [the words] defame" and thus are not defamatory in law. *Id.*

¶44. It is true that Deborah speaks harshly about "you" when she says that "none of you would produce the evidence to verify I received my 20% so this would have to be intentional planning." But this critique regarding the failure of "you" (presumably the children) to provide her with paperwork falls short of defamatory language. As the Supreme Court has said, "our sensitivity to the destructive power of words hardly suggests we assess damages for all bruised feelings." *Id.* at 699 (quoting *Ferguson*, 448 So. 2d at 276). "Claims of defamation must rest upon sterner stuff than the innuendo, speculation and conjecture . . . [the plaintiff] presents to us this day." *Fulton*, 498 So. 2d at 1217. "'[M]any demonstrably unfair' 'linguistic slings and arrows' are not actionable." *Perkins*, 270 So. 3d 218 (¶35)

22

(quoting *Ferguson*, 448 So. 2d at 276). Here, as a matter of law, the emailed statement was not defamatory.

#### IV. Summary Judgment on the Wiretapping Claims

¶45. Finally, Brian contends that summary judgment was improper for his wiretapping claims because genuine issues of material fact were present. Because there is a genuine issue of material fact present, we reverse the order granting summary judgment on these claims alone and remand the case to the trial court for further proceedings.

¶46. Brian's complaint alleges that Deborah recorded his private conversations in violation of 18 U.S.C. § 2511 and Mississippi Code Annotated sections 41-29-501 to -536 (Rev. 2018). Section 2511 "deals with wire, electronic and oral communications interception. It generally prohibits interception and disclosure of wire, oral and electronic communications except those specifically provided for in the Act." *Wright v. Stanley*, 700 So. 2d 274, 277 (Miss. 1997) (referencing 18 U.S.C. § 2511). Specifically, the pertinent portion of the statute states:

> (1) Except as otherwise specifically provided in this chapter any person who–
>
> > (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;
> > . . . .
>
> (4)(a) . . . whoever violates subsection (1) of this section shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 2511(1)(a), (4)(a). The statute defines "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not

subject to interception under circumstances justifying such expectation." 18 U.S.C. § 2510(2); *Boddie v. Am. Broad. Cos. Inc.*, 731 F.2d 333, 338 (6th Cir. 1984). "The statute defines 'intercept' as the 'aural acquisition of the contents of any wire or oral communication through the use of any electronic, mechanical, or other device.'" *Id*. (quoting 18 U.S.C. § 2510(4)).

¶47.    "The Mississippi wiretap prohibition is almost identical to the federal statute." *Wright*, 700 So. 2d at 280.   Analogous to the federal statute, the Mississippi statute provides civil recourse for violation of the statute.  *See* Miss. Code Ann. § 41-29-529 (Rev. 2018).[13] Just like the federal statute, our state law also provides a list of those who are immune from civil liability.  Miss. Code Ann. § 41-29-531 (Rev. 2018).  Relevant to the present case, a person is immune from civil liability who is

> not acting under color of law who intercepts a wire, oral or other communication if the person *is a party* to the communication, *or if one (1) of the parties to the communication has given prior consent to the interception* unless the communication is intercepted for the purpose of committing any

---

[13] The applicable portion of section 41-29-529 states:

(1) A person whose wire, oral or other communication is intercepted, disclosed or used in violation of this article shall have a civil cause of action against any person who intercepts, discloses or uses or procures another person to intercept, disclose or use the communication, and is entitled to recover from the person:

> (a) Actual damages but not less than liquidated damages computed at a rate of One Hundred Dollars ($100.00) a day for each day of violation or One Thousand Dollars ($1,000.00), whichever is higher;
> (b) Punitive damages; and
> (c) A reasonable attorney's fee and other litigation costs reasonably incurred.

criminal or tortious [or any other injurious] act.

Miss. Code Ann. § 41-29-531(e) (emphasis added); *see also* 18 U.S.C. § 2511(2)(d) (providing that interception is not unlawful under the Federal Wiretap statutes when a person is party to the communication or where one party to the communication has given consent unless the communication is intercepted for the purpose of criminal or tortious acts).

¶48.    Here, Deborah urges that summary judgment is appropriate in this claim because (1) she attested that Bill gave his consent to the recordings that she was not a party to, which she documented in a recording she submitted to the record; (2) Brian had no reasonable expectation of privacy in her home and hospital room; (3) she had no intent to intercept Brian's conversation; and (4) no damages resulted as a result of the recordings.[14]   But these claims and defenses are all questions of fact for a jury. *See Boddie*, 731 F.2d at 338-39 (Whether plaintiff had expectation of privacy and "whether that expectation was justified under the circumstances" is an issue of fact for the jury.); *Kee v. City of Rowlett*, 247 F.3d 206, 213-15 (5th Cir. 2001) (The determination of a reasonable expectation of privacy uses factor-based test heavily dependant on facts.); *Fultz v. Gilliam*, 942 F.2d 396, 404 (6th Cir. 1991) (Whether the party had the intent to intercept a conversation is a jury question.); *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 582 (11th Cir. 1983) (The trier of fact determines the scope of the consent to determine whether the intercepted message exceeds the consent.).   At the summary judgment phase, of course, this Court must not determine issues of fact. *Am. Legion Ladnier Post No. 42 Inc. v. City of Ocean Springs*, 562 So. 2d

---

[14] We note that damages are statutorily provided.  Miss. Code Ann. § 41-29-529; *see also* 18 U.S.C. § 2520 (authorizing civil damages under the federal wiretap statutes).

103, 106 (Miss. 1990). We must review the evidence to determine only whether a genuine issue of material fact exists, viewing such evidence in the light most favorable to the non-movant. *Karpinsky v. Am. Nat. Ins. Co.*, 109 So. 3d 84, 88 (¶¶9-10) (Miss. 2013).

¶49. "Trial judges must be sensitive to the notion that summary judgment may never be granted in derogation of a party's constitutional right to trial by jury." *Brown*, 444 So. 2d at 362 (citing Miss. Const. art. 3, § 31). Here, the trial court was too hasty in granting summary judgment on the wiretapping claims. "Issues of fact sufficient to require denial of a motion for summary judgment obviously are present where one party swears to one version of the matter in issue and another says just the opposite." *Dennis v. Searle*, 457 So. 2d 941, 944 (Miss. 1984). Furthermore, "[i]ssues of fact . . . also exist where there is more than one reasonable interpretation that may be given undisputed testimony, where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted facts, or where the purported establishment of the facts has been sufficiently incomplete or inadequate that the trial judge cannot say with reasonable confidence that the full facts of the matter have been disclosed." *Id*.

¶50. In the present case, Brian and Deborah disagree over whether the recordings produced by Deborah capture hospital staff knocking when entering Bill's hospital room (an indication of whether Brian had a reasonable expectation of privacy there). Brian's and Alissa's sworn affidavits attest that hospital staff would "first knock and announce themselves." The parties dispute whether Deborah's recordings, which she submitted as a response to a request for production on the same day as her motion for summary judgment, capture knocking by the

26

staff. Brian and Deborah also disagree on the scope, date, and context of the May 23, 2015 recording of Bill, in which he told Deborah to "sit there and record." And finally, Brian separately relies on self-transcribed recordings that are not in evidence, thus rendering the establishment of facts incomplete. Because (1) Brian attests Deborah's recordings show knocking while Deborah claims they do not; (2) materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted May 23, 2015 recorded statement by Bill; and (3) the purported establishment of the facts is incomplete or inadequate so that the full facts of the matter have not been disclosed, summary judgment was not appropriate on this particular claim. *Id*.

## CONCLUSION

¶51. In conclusion, we hold that the trial court did not err in granting summary judgment without a hearing or without issuing facts or conclusions of law under Mississippi Rule of Civil Procedure 52 or in granting summary judgment in light of the discovery disputes. We also affirm the grant of summary judgment on Brian's defamation claim. But we reverse the trial court's grant of summary judgment on the issue of Brian's wiretapping claims and remand for proceedings consistent with this opinion.

¶52. **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**